[Civ. No. 13762.   First Dist., Div. One.   Jan. 11, 1949.]

FRED WATWOOD, Respondent, v. JACOB STEUR et al., Defendants; MARIANNE MOORE et al., Third Party Claimants and Appellants.

Leo R. Friedman and Mack J. Koblick for Third Party Claimants and Appellants.

G. D. Schilling and W. J. Kirkpatrick for Respondent.

PETERS, P. J.—The appellants' statement of the facts is concise and accurate, so far as it goes, and is, in part, as follows (App. Op. Br. p. 2):

"On September 17, 1946, the plaintiff's assignor obtained a judgment by default against the defendants Jacob Steur and Marie Steur for the sum of $115,273.80. An execution was issued on said judgment, and pursuant to instructions from plaintiff's counsel, the Sheriff levied upon a safe deposit box at the Day and Night Branch of the Bank of America National Trust & Savings Association, which stood in the name of Marie Brouwer, the maiden name of the defendant Marie Steur. On May 16, 1947, the appellant Marianne Moore, the daughter of the defendants, and her husband, the appellant Audrey Carl Moore, filed two third party claims to certain personal property which was found in the said safe deposit box. . . . Mrs. Moore claimed as her separate property the sum of $9,600 in cash, a certain black leather wallet, a certain envelope, bearing the name of Bud Moore on the face thereof,

containing three $50 United States War Savings Bonds, and a certain certificate of automobile ownership, which said certificate showed Marianne Moore as the registered owner of a certain Chevrolet automobile. Audrey Carl Moore, by his verified claim, set forth his ownership of the sum of $1,000, which was in the form of a $1,000 bill, in the said safe deposit box.

". . . the Superior Court made findings . . . which, after reciting the judgment, the execution and the filing and contents of the two third party claims, finds that the claims of appellants and each of them are without right, and that appellants have no interest in the property described or any part thereof. It was further set forth in the findings that the defendants and judgment debtors Jacob Steur and Marie Steur were the owners and entitled to the possession of the personal property involved in these proceedings at the time when the same was levied upon; that the said personal property is subject to the writ of execution levied in said action, and that the plaintiff had the right to have said property taken by said Sheriff." Judgment was entered accordingly, and from that judgment the two third party claimants appeal. It is their main contention that, as to each item of property involved, the evidence, without conflict and as a matter of law, shows that appellants were and are the owners of the property. The findings that the property belonged to Mr. and Mrs. Steur are attacked as being totally unsupported. Respondent urges that all of the challenged findings are amply supported.

This proceeding was brought under section 689 of the Code of Civil Procedure. Under the express terms of that section "the third party claimant shall have the burden of the proof."

■ It is equally clear, as urged by appellants, that an attachment or execution creditor acquires only the actual interest of the debtor. (*Kinnison* v. *Guaranty Liquidating Corp.*, 18 Cal.2d 256 [115 P.2d 450]; *Jensen* v. *Hugh Evans & Co.*, 18 Cal.2d 290 [115 P.2d 471]; *Estate of Bennett*, 13 Cal. 2d 354 [90 P.2d 84, 126 A.L.R. 771]; *Carpenter* v. *Devitt*, 49 Cal.App.2d 473 [122 P.2d 79]; *Henry* v. *General Forming, Ltd.*, 33 Cal.2d 223 [200 P.2d 785].)

■ The problem is whether the record shows, as a matter of law, that the properties involved belonged to the third party claimants as urged by appellants. As already pointed out, the burden of proving this fact rested on appellants, and the trial court has found that appellants did not sustain that burden. The fundamental error in the position of appellants

is that they argue, in effect, that, because the Steurs and the third party claimants testified that the properties belong to appellants, the trial court was bound by their testimony. That is not the law. The trial judge saw these witnesses. He knew of the interest of the Steurs and of the appellants in convincing the court that the properties belonged to appellants. (See cases collected 27 Cal.Jur. § 154, p. 179, on the importance of this factor.) He has seen fit to find that appellants did not sustain the burden that was upon them. If it be assumed that the only evidence in the case on this issue was that of appellants and of the Steurs (which assumption is contrary to the fact), nevertheless, the trial court was not necessarily bound by even this assumed uncontradicted testimony. While, under section 1847 of the Code of Civil Procedure a witness is presumed to speak the truth, the same section provides that: "This presumption, however, may be repelled by the manner in which he testifies, by the character of his testimony . . . or his motives, or by contradictory evidence." The trier of the fact is the exclusive judge of the credibility of the witnesses. Provided he does not act arbitrarily, the trial judge may reject *in toto*, the testimony of a witness even though the witness is uncontradicted. (*Hicks* v. *Reis*, 21 Cal.2d 654 [134 P.2d 788]; *Blank* v. *Coffin*, 20 Cal.2d 457 [126 P.2d 868]; *Davis* v. *Judson*, 159 Cal. 121 [113 P. 147]; see cases collected 27 Cal.Jur. § 156, p. 182; 8 A.L.R. 796.)

There is another general principle involved. The safe deposit box was in the name of Marie Brouwer, the maiden name of Marie Steur, one of the judgment debtors. The other judgment debtor, Jacob Steur, husband of Marie, was the only other person that had a right of entry to the box, and it was he who visited it most frequently. Neither of the third party claimants had a right of entry to the box. With the exception of the automobile ownership certificate hereafter discussed, the box contained either money, without designation of who owned it, or was property in the name of the judgment debtors. All of the properties were in the possession of Marie Steur. Section 1963, subdivision 11, of the Code of Civil Procedure, provides that it is a rebuttable presumption "That things which a person possesses are owned by him," while subdivision 12 of the same section creates the rebuttable presumption "That a person is the owner of property from exercising acts of ownership over it, or from common reputation of his ownership." These rebuttable presumptions

are themselves a species of evidence and tend to support the findings.

There is another bit of evidence that affects several of the properties here involved. Officers of the bank testified that it was impossible to have access to the safe deposit box without signing an entrance slip; that such slips were preserved; that a careful search of the records of the bank showed that the last entry to the box, prior to the forcible entry made by the sheriff, was in October, 1945, one officer testifying that the last entry was October 18, 1945, another testifying that it was October 24, 1945. Jacob Steur testified that he visited the box several times in 1946. The date of the last entry is of vital importance because the judgment debtors and the appellants testified that the properties in question belonged to appellants. The respondent, in the nature of things, had little direct evidence to the contrary. But what it did show, if its evidence that October, 1945, was the date of the last entry to the box is to be believed, was that such date was, according to the evidence produced by appellants, *prior* to the time the appellants claim they gave some of the properties in the box to Marie Steur to keep for them. If the bank's evidence is true, that of appellants is untrue. Appellants attack the evidence of the bank officials by pointing out that the bank is the judgment creditor in this case and is, in fact, the real respondent in interest; that the bank had control of the entrance records; that it was the bank officials who made the search; and that the slips could, in self interest, have easily been withdrawn from the files by the bank officials. The interest of the bank and its officials was known to the trial court and it undoubtedly considered this factor in passing on the credibility of the witnesses. It has resolved this conflict in favor of respondent. Its determination, being based on substantial evidence, cannot be set aside by this court. For this reason, we must conclusively presume on this appeal that the date of the last entry to the box was October, 1945. We now proceed to consider the evidence as to each item of property involved.

### The United States Savings Bonds

Three $50 United States War Bonds, Series E, were found in the box. These bonds were in the name of Marie Steur, payable on her death to Marianne Moore, daughter of Marie, and one of the appellants. They were in a manila envelope, on the face of which appeared the name of ''Bud''

Moore, husband of Marianne, and also a third party claimant. Marianne claims that these bonds were her property. She and her husband, who was the band leader at the Golden Gate Theater and the operator of a theatrical agency, testified that they bought these bonds during the war on an occasion when the theater was giving a bond show, and required purchase of a bond to secure admission. Marianne testified that she bought the three bonds in order to take her father and mother to the performance. Appellant Audrey Moore, husband of Marianne, testified that he knew when the bonds were made out that the ownership had been designated incorrectly, but felt that it did not make any difference. Marianne Moore testified that, after using the bonds to secure admission to the theater, she delivered them to her mother to keep for her. This was corroborated by the mother.

The conclusion of the trial court that Marianne Moore did not sustain the burden of proving that these bonds were her property is amply supported. The bonds designated Marie Steur as the owner, and were in her possession. The presumption is that they were her property, and whether that presumption was rebutted was for the trial court. It disbelieved Marianne and her mother, and chose to find in accordance with the presumption. Under such circumstances its finding is legally unassailable.

### Certificate of Automobile Ownership

■ ██ A certificate of ownership of a Chevrolet automobile was found in the manila envelope above described. This certificate described Marianne Moore as the legal owner of the car. Marianne testified that the automobile belonged to her; that she bought the car in 1943 for approximately $1,100; that she paid $480 down with *cash* given her by her husband; that she paid the balance within 30 days but could not remember whether this payment was in cash or by check; that she thought the signature on the registration card had been made by her. Audrey Moore, her husband, testified that he gave his wife $500 *in cash* to make the down payment, and that within 30 days he gave her the balance partly in *cash* and partly by check. Marie Steur testified that the car belonged to Marianne, and that she, Marie, did not give Marianne any portion of the purchase price. She admitted, however, that she had signed her daughter's name to the registration card, stating that she did so because her daughter was ill. Certainly, if this testimony had been believed it would have sup-

ported a finding that the car belonged to Marianne. But this testimony does not stand unimpeached. The credit manager of the company that sold the car testified that the company records showed that the only credit statement taken at the time of the purchase related to the credit rating of Mrs. Steur; that the credit card indicated that the information on the card was given by the person who signed the card, who was designated as "Marianne Moore." It was stipulated that Mrs. Steur signed her daughter's name to this card. The records of the company also disclosed that the down payment of $480 was made on June 16, 1943, and was paid by check drawn on the Day & Night Branch of the Bank of America, and received from Marianne Moore; that the balance was $721.85 which was paid on July 13, 1943; that the bank deposit tag of the company for the day the balance was drawn shows a check for $521.85 drawn on the Day & Night Branch of the Bank of America. An officer of that bank testified that the bank's records disclosed that in that bank there was an account in the name of the Pharaoh Apartments on which Marie Steur was the only party entitled to draw. Marie Steur was the manager of that apartment. Her account showed withdrawals on June 18, 1943, of $480, and on July 16, 1943, of $521.85. After these facts had been testified to counsel for the bank asked if the other side would stipulate that "the down payment for this automobile and the greater portion of the final payment was a check drawn by Mrs. Steur on the account of Pharaoh Apartments, carried at the Day & Night Branch." Mrs. Steur replied: "It could be." Her counsel refused to stipulate, stating: "It's possible. I don't know. . . . Go ahead and prove it. I say it is possible."

Thus, it is to be noted, that in practically every particular where evidence, independent of the Moores or Steurs, could be secured, their testimony was contradicted by record evidence. In view of the record, the trial court was justified in disbelieving the Steurs and the Moores, and in concluding that Marie Steur had paid for the car and taken it in her daughter's name to protect it against creditors.

### Claim of Audrey Moore for $1,000 Bill

When the safe deposit box was opened, a considerable amount of currency was found therein. There was nothing in the box to indicate that this money did not belong to Marie Steur. Included within this currency was a $1,000 bill which

Audrey Moore claims as his property. Audrey testified that, because of his occupation as band leader and operator of a theatrical agency, he did considerable entertaining of theatrical people; that he found it expedient at such times to flash a big bankroll in order to create an affluent impression; that for this purpose he acquired a $1,000 bill in April or May of 1946; that his wife worried about him carrying around so much money; that his wife became ill and had to go to the hospital for an operation, and, while there, expressed concern over his carrying this bill around, and over what would happen to their daughter Judy if she, Marianne, should die; that, to relieve his wife's mind, in November, 1946, he agreed to and did give the $1,000 bill to Mrs. Steur to "put with the rest of my wife's money and keep it for us. . . . That was in case anything happened that my wife's mother was to raise our child." He testified, positively, that he gave this money to Mrs. Steur in trust for the benefit of his daughter. Mrs. Steur corroborated him.

It will be remembered that the bank's records disclosed that the last visit to the safe deposit box was in October, *1945.* Obviously, if that testimony was believed by the trial court, as it apparently was, the $1,000 bill claimed to have been given to Mrs. Steur in November, *1946,* could not have been the bill in the safe deposit box. This evidence, as well as the rebuttable presumptions above referred to, support the finding of the court.

### *Cash in the Amount of $11,450*

In the safe deposit box was a black leather wallet which contained $11,450 in currency. There were no markings on the bills or the wallet to indicate that the money did not belong to Mrs. Steur. Marianne Moore testified that many years ago her father had given her the wallet; that she had always kept money in it; that shortly after her marriage she gave the wallet to her mother to keep her (Marianne's) money in it; that she thus gave her mother money in trust because she had an agreement with her mother that if she, Marianne, should die, the mother would raise her daughter; that this was most important to her because her husband, being in the theatrical business, had to be away nights; that $9,600 of the currency in the wallet belonged to her. Mrs. Steur corroborated her daughter. Marianne had kept no accounts of the money thus claimed to have been delivered to her

mother, but she attempted to show where she got the $9,600 involved. She divided her claim into five parts—$1,500 derived from the sale of property on Roosevelt Way; $3,500 received from her husband, who got the money upon the sale of their home on 27th Avenue, put it in government bonds, sold the bonds and gave her the proceeds; $800 derived from the sale of their furniture when they sold their home; $2,400 derived from various sources; and $1,400 derived from rents from the Hallam Street property. These will be considered in order.

*$1,500 item*: Marianne testified that many years ago her father had given her a lot on Roosevelt Way; that sometime in *1946* she sold it, receiving $500 in cash and a check from the title company for $1,000 which she cashed; that she gave the entire sum to her mother to keep for her in the safe deposit box. The escrow officer of the title company that had handled the sale testified that the company's records showed that Marianne received for the property $988.48 paid to her by check dated March 12, 1946 (not $1,500). Jacob Steur testified that he endorsed Marianne's name to the check and deposited it in the Anglo bank for her. The appellants tried to explain how they received $500 plus more for the property than was disclosed by the records. The sufficiency of this explanation was for the trial court. Admittedly, this money was not received by Marianne until March, 1946, so that if the safe deposit box was not opened after October. 1945, no portion of the money received from the sale of this lot could have been in the box. This evidence, the rebuttable presumptions, above discussed, and the evidence concerning the discrepancy of the $500, support the challenged finding.

*$3,500 item*: Marianne testified that in 1944 she and her husband sold their home on 27th Avenue; that her husband invested the proceeds in government bonds; that she objected to this investment, so that in 1945 he sold the bonds; that he then gave her $3,500 in cash which she handed over to her mother to keep for her. Respondent tried to prove that the proceeds from the bonds were in fact used by the Moores as a down payment on their present home, purchased in October, 1945. Mr. Moore testified that he thought that the down payment was $6,000. The title company records showed that a down payment of $3,500 was paid by a check by the Moores dated October 18, 1945. Mr. Moore testified that he thought he received $3,200 on the sale of the bonds; that

he deposited the funds so received, drew a check for that sum and cashed it and added enough to make $3,500, and gave the total sum to his wife. His bank account showed no withdrawals of about $3,200 about the period in question. His account shows a deposit of $3,000 on October 18, 1945, and that a check was paid on October 19 or 20, 1945, in the sum of $3,500, which was apparently the check drawn as a down payment on the house. Appellants proved that the order to sell the bonds was not given until October 19, 1945, so that the bond money could not have been used to make the payment of October 18, 1945. Appellants contended that their records showed that the bond check was cashed on October 25, 1945. As already pointed out, the bank's records showed that the last entry to the safe deposit box was October 24, 1945. It follows that money admittedly not received until October 25th could not have been in the box. That evidence and the rebuttable presumptions heretofore mentioned support the finding.

*$800 item*: Marianne testified that, when she and her husband sold their home on 27th Avenue, she sold some of the furniture for cash and received $800, which she turned over to her mother to keep for her. Respondent introduced no direct evidence to contradict directly this testimony. But the rebuttable presumptions to which reference has been made support the court's findings, as presumptions are a species of evidence in this state.

*$2,400 item*: Marianne also testified that from various sources she had accumulated $2,400 in cash; that in October, 1946, she became ill and was forced to undergo a serious operation; that she feared she might not return from the hospital; that for that reason she turned the $2,400 over to her mother to be placed with her other money for the care of Judy if she, Marianne, should die. This money was not delivered to Marie Steur until October, 1946, which was a year after, according to the bank's records, the box had last been opened. This testimony, and the rebuttable presumptions support the finding.

*$1,400 item*: Marianne testified that she received $50 a month rent from certain property on Hallam Street; that the rent was paid by check and that then she cashed the checks; that she would accumulate the rent money for several months and then turn it over to her mother to keep for her; that she kept no records of the amounts so turned over, but that it was

"approximately around $1,400"; that she could not remember specific dates when this money had been delivered to her mother. When asked, "So that during the year 1946 there might have been 10 or 12 different occasions for you to give your mother money?" (referring to the rent money and other sums), she answered, "Probably even more often." She also testified that she had given her mother some rent money in 1947. Obviously, these dates were after the date the bank's records show the box was last opened. This testimony, and the rebuttable presumptions, support the finding.

■ *Conclusion*: It is the theory of the appellants that this action must be regarded as if it were between the third party claimants, the Moores, and the judgment debtors, the Steurs. That is correct. (*American Fruit Growers, Inc.* v. *Jackson*, 203 Cal. 748 [265 P. 926].) But the next step in the legal reasoning of appellants is to assert that, since the third party claimants and the judgment debtors agree that the property belongs to the third party claimants, the court was bound to find in accordance with this "uncontradicted" and "unimpeached" testimony. Of course, the trial court was not bound by the testimony of the claimants and debtors. The burden was on the claimants. As to every item of property involved there was a direct or indirect conflict. This being so, the findings of the trial court must be sustained.

The judgment appealed from is affirmed.

Ward, J., and Bray, J., concurred.