[L. A. No. 25356. In Bank. Aug. 10, 1960.]

J. P. BUTLER, Plaintiff and Respondent, v. EDWARD NEPPLE, Defendant and Appellant; RAYMOND C. TURNBULL et al., Cross-Defendants and Respondents; NEPPLE PARTNERSHIP A (a Limited Partnership) et al., Third Party Claimants and Appellants.

Kendall & Howell and Donald G. Kendall for Appellants.

Brown & Grisham and Roy J. Brown for Respondents.

DOOLING, J.—Plaintiff as assignee of one Turnbull brought this action to recover delay rentals claimed to be due under paragraph 3 of an assignment of an oil and gas lease. The case was tried by the court without a jury. Judgment was rendered for plaintiff in the sum of $20,352 (being six months' rental at $3,000 per month, plus interest). Meanwhile levy had been made on two bank accounts, purportedly belonging to defendant. After the entry of judgment, a third party claim was made to one of the bank accounts on the premise that the funds belonged to certain limited partnerships of which defendant Edward Nepple was a member, rather than to defendant individually. Following a hearing, an order was made denying the third party claim. Defendant appeals from the judgment, and the third party claimants appeal from the order denying their third party claim.

Cecil O. Basenberg was the lessee on the original lease. For the purpose of negotiating a sale to defendant, Basenberg assigned the lease to Raymond C. Turnbull, who, in turn, assigned it to defendant for $15,000. The assignment from Turnbull to defendant in paragraph 3 thereof provided: "Commencing with (*sic*) six (6) months from April 1, 1956, if the Assignee has not theretofore commenced drilling operations upon the above described lands or reassigned all of his right, title and interest hereunder to the Assignor, the Assignee shall pay or tender to the Assignor monthly in advance, as rental, the sum of Three Thousand Dollars ($3,000.00) per month until drilling operations are commenced or until the Assignee shall have reassigned his rights hereunder to the Assignor; provided, however, that the Assignee cannot defer the commencement of drilling operations by the payment of rental hereunder for a period extending beyond one (1) year from date hereof."

The assignment was made subject to all of the terms of the

original lease. The lease required the drilling of a well 8,200 feet deep. On September 30, 1956, which was one day prior to the expiration of the six months' period allowed for the commencement of drilling under the assignment, defendant had a surveyor stake out the location of the well. The next day a portable rig was moved onto the property, a cellar was dug and shored with wooden planking, and some 25 feet of conductor pipe was set and cemented. At the same time defendant filed the required notice of intention to drill and the drilling bond with the State Division of Oil and Gas. Defendant alleged in his answer that this location work cost approximately $970. When the location work was done, all equipment was removed from the property and no further acts in relation to drilling operations were undertaken. Finally on March 15, 1957, defendant reassigned the lease to Turnbull.

Defendant alleged as a special defense that he was unable to comply with the drilling schedule because of inability to procure the required well casing due to a steel strike; and that under a *force majeure* clause in the lease, the existing conditions excused him from performance of his obligation to commence drilling or pay rental pending his reassignment of the lease.

The trial court found that the preparatory work of defendant on the leased property did not constitute the ''commencement of drilling operations within the meaning and intent of'' the lease and assignment; and that it was untrue that defendant was prevented from complying with his obligations because ''it was impossible for [him] to obtain in sufficient quantity casing of the type and quality needed to drill an oil well to a depth of 8,200 feet.'' Accordingly, judgment was entered for plaintiff for the six months' delay rental as sought.

Although other matters are argued, particularly whether a *force majeure* clause in the original lease can have any application to defendant Nepple's obligations under paragraph 3 of the assignment from Turnbull to defendant, our conclusions on the following three questions are sufficient to require the affirmance of the judgment: (1) the interpretation of the lease and assignment in determining whether or not defendant's failure to commence drilling operations automatically terminated his obligations under paragraph 3 of the assignment or required payment of delay rental as an alternative covenant; (2) the sufficiency of the evidence to sustain the findings of the trial court as to defendant's failure to

commence drilling operations within the purport of the lease and the assignment, and the availability of the required well casing in negation of defendant's claim that a steel strike prevented his compliance with his drilling obligations; and (3) a claim of estoppel based on a proposed modification agreement affecting the drilling operations.

1. *Was defendant bound to pay rental by paragraph 3 until he reassigned the lease if he did not commence drilling as required by that paragraph?*

Two types of oil and gas lease provisions providing for the payment of rental as an alternative to the obligation to drill or commence drilling are commonly recognized, the "unless" type and the "drill or pay" type. ▇▇▇ . In the "unless" type the lease is automatically forfeited or terminated unless the lessee either drills or pays the rental as provided in the lease. ▇▇▇ In the "drill or pay" type the lease is not forfeited or terminated by the failure to comply with its terms, but upon the failure to drill or commence drilling as required, the obligation to pay rental becomes absolute as an alternative requirement. (See 13 So.Cal.L.Rev. 393, 402-406; 2 Summers, Oil and Gas, perm. ed., § 335, p. 378, § 337, p. 385; 36 Cal.Jur.2d, Oil and Gas, §§ 113-114, pp. 717-719.)

▇▇▇ On its face paragraph 3 of the assignment to defendant Nepple is clearly of the "drill or pay" type. Nepple binds himself to one of three alternatives: (1) to commence drilling within six months of April 1, 1956; or (2) to pay rental at the rate of $3,000 per month; or (3) to reassign the lease. The language of paragraph 3 is too clear to permit of any other construction, since defendant binds himself to "pay or tender . . . as rental . . . ($3,000.00) per month until drilling operations are commenced or *until the Assignee shall have reassigned his rights hereunder to the Assignor.*" (Emphasis added.) The emphasized language would be meaningless if the failure both to commence drilling and to pay rental worked an automatic forfeiture. Paragraph 3 of the assignment clearly bound the defendant to the payment of rental upon the failure to commence drilling as required "for a period (not) extending beyond one (1) year from date hereof," i.e., until April 1, 1957, or "until the Assignee shall have reassigned his rights. . . ." If the finding that defendant did not commence drilling as required by the lease is supported by the evidence, the judgment for six months' rental was required by paragraph 3. (See *Griffin* v. *Kent,*

111 Cal.App. 569, 571 [295 P. 854]; *Title Ins. etc. Co.* v. *Amalgamated Oil Co.*, 63 Cal.App. 29, 39 [218 P. 71].)

Defendant argues that the original lease was of the "unless" type. This may be conceded but it does not help defendant because he bound himself to the conditions of paragraph 3 of the assignment by Turnbull. These and other new conditions in effect made the so-called assignment a sublease between Turnbull as sublessor and defendant as sublessee (*Hartman Ranch Co.* v. *Associated Oil Co.*, 10 Cal.2d 232, 242-243 [73 P.2d 1163]), and as between them, the provisions of paragraph 3 bound defendant to its terms.

It must be conceded that if the original lease had been terminated by defendant's failure to commence drilling operations as required by the assignment to him, his rights under the assignment of the lease would have likewise terminated. But in the original lease, which was dated December 6, 1955, the lessee by paragraph 6 thereof was given 18 months within which to commence drilling operations, a period well beyond the time for which rentals were recovered from defendant in this case.

2. *Is the evidence sufficient to support the findings?*

Defendant argues that the location work that he did commencing September 30, 1956, must be held to constitute the commencement of drilling. It is true that under the authorities, work preparatory to drilling may be sufficient to constitute the commencement of drilling, but this rule is qualified by the requirement that such preliminary work must be something more than a pretense, i.e., must be done with the bona fide intention to follow it with actual drilling operations prosecuted with reasonable diligence. The rule is stated in 2 Summers, Oil and Gas, permanent edition, section 349, pages 459-460, that "the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises, and similar acts preliminary to the beginning of the actual work of drilling, *when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well*," (emphasis added) constitute the beginning of drilling operations. (36 Cal.Jur.2d, Oil and Gas, § 56, pp. 660-661; *Stetson* v. *Orland Oil Syndicate, Ltd.*, 42 Cal.App.2d 139, 141-142 [108 P.2d 463]; *cf. Wilcox* v. *West*, 45 Cal.App.2d 267, 272 [114 P.2d 39].) As a corollary to this requirement, it is further stated in 2 Summers, *supra,* section 349, pages 467-468, that where, after the doing of such prepara-

tory work, the drilling "has not continued . . . with due diligence, this is evidence to show that the commencement of the well was not done in good faith. . . ."

Plaintiff relies on this evidence: The last-minute flurry of activity by defendant in preparing for drilling operations required only one or two days' work at a cost of but $970. Immediately thereafter, defendant caused planking to be placed over the cellar and nailed down, and no further work was done during the period of almost six months that defendant retained the lease. Meanwhile defendant had drilled two equally deep or deeper wells under another lease in the same oil field and requiring similar casing. These wells each cost some $200,000 for drilling. However, as of October 1, 1956, the expiration date of the six months' period for the commencement of drilling operations under the assignment, interest in deep zone drilling in this oil field had generally subsided, and defendant's own engineer had advised defendant that the site in question was not a valuable economic prospect for a deep well. Furthermore, defendant's financial ability to drill another well appeared problematical in view of his lack of an established bank credit as a source of additional funds and of defendant's own testimony that the needed funds would have to be obtained from "friends who would choose to join in the project" though he had no definite arrangements or commitments for such funds. On the basis of this evidence, plaintiff argues that defendant's preparatory activities, involving little time and expense, were no more than a holding device to retain possession of the leased oil land while other operators developed information as to the best procedure to follow in developing the oil field.

Defendant, on the other hand, relies on this evidence: Turnbull knew that defendant's drilling program required that defendant first drill the other two wells in the same oil field, for Turnbull had sold defendant the leases covering them as a prior commitment. According to defendant, his preparatory work on the site in question was consistent with the import of the commencement of drilling operations followed with respect to other wells; that these were all the physical acts necessary to be performed until a portable rig could be moved onto the property for the actual drilling. As to financial ability, defendant claimed that he budgeted the drilling of the well at a cost of between $150,000 and $200,000, and that he had associates who would contribute the necessary funds as well as ample credit at supply houses.

With respect to defendant's ability to obtain the needed

casing for the 8,200-foot well, the parties agree that the casing situation was acute by reason of a steel strike in July, 1956. However, plaintiff refers to defendant's testimony in his deposition that in the fall of 1956 both Turnbull and Basenberg had furnished defendant with a list of possible suppliers of the needed casing, and that defendant had made some inquiries but found the ''prices were way over the regular prices.'' Also at the trial, defendant stated that he ''could have drilled a well to the deeper zone (8,200 feet)'' if he had been willing to ''pay a premium price for casing.'' When pressed further on this point, defendant countered with a recouping statement that he was not offered any of the needed casing ''even at a premium price.''

■ In reviewing the evidence, all conflicts must be resolved in favor of the questioned findings and all reasonable inferences indulged in their support. (*Estate of Teel,* 25 Cal.2d 520, 526-527 [154 P.2d 384]; *Bancroft-Whitney Co.* v. *McHugh,* 166 Cal. 140, 142 [134 P. 1157]; *Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367, 370 [210 P.2d 757]; *Buckhantz* v. *R. G. Hamilton & Co.,* 71 Cal.App.2d 777, 780 [163 P.2d 756].) ■ While there was no explicit finding that defendant did not act in good faith in his purported commencement of drilling operations, lack of good faith on the part of defendant was impliedly included in the finding that defendant's preparatory activities upon the leased property did not constitute the ''commencement of drilling operations within the meaning and intent'' of the lease and assignment. To this point, defendant cites *Wilcox* v. *West, supra,* 45 Cal. App.2d 267, 273, as declaring, under somewhat similar circumstances, that where there are ''two inferences, equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice,'' it is ''the duty of the court or jury to draw the inference favorable to fair dealing.''

■ Since the failure to prosecute drilling operations with reasonable diligence after the original preparatory work was done ''is evidence to show that the commencement of the well was not done in good faith'' (2 Summers, Oil and Gas, perm. ed., § 349, pp. 467-468, cited *supra*),[1] it is important

[1]This is a specific application of a more general rule thus stated in *Longway* v. *Newbery,* 13 Cal.2d 603, 611 [91 P.2d 110]: ''. . . *the subsequent failure to perform* warrants the inference that appellants *did not intend to perform* when they promised.'' (*Cf. Cox* v. *Klatte,* 29 Cal.App. 2d 150, 161 [84 P.2d 290]; *Estate of Barrow,* 27 Cal.App.2d 402, 405 [80 P.2d 1006]; *Wilson* v. *Rigali & Veselich,* 138 Cal.App. 760, 765 [33 P.2d 455].)

to remember that the burden of proving impossibility of performance was on the defendant. (*Oosten* v. *Hay Haulers etc. Union,* 45 Cal.2d 784, 788 [291 P.2d 17].) In this connection defendant relied upon a *force majeure* clause of the original lease providing that the "obligations of the Lessee . . . shall be suspended while the Lessee is prevented from complying therewith, in whole or in part, by strikes, lockouts, actions of the elements, . . . or other matters or conditions beyond the control of the Lessee, whether similar to the matters or conditions herein specifically enumerated or not." Plaintiff challenges the application of this clause to the obligations of defendant assumed in paragraph 3 of the assignment, but conceding without deciding its applicability, the trial court was amply justified in finding that defendant's own testimony, referred to above, failed to carry the burden of proof imposed upon him on this issue. Defendant, in part, testified on his deposition that he was furnished lists by Turnbull and Basenberg of persons who had used casing for sale of the type needed to drill this well. He then testified: ". . . I followed up on the two specific people that were named and found out that the used casing was grossly overpriced. In fact, either Mr. Turnbull or Mr. Basenberg handed me a memorandum or mailed it to me, stating prices of casing, which were completely out of line with the going price. That wasn't uncommon at the time. They called it black-market prices. . . .

"Q. Did you contact the people, the party concerning which the memoranda with the prices on it referred to? A. Yes. Q. Do you recall who that was? A. No. But I think I still have the memorandum. I do know the prices were way over the regular prices. Q. Do you recall what the prices asked were? A. No."

Also, although defendant otherwise testified on the trial that there was no casing of the kind required available, he gave the following answer to the following question: "Q. And also you could have at that time drilled a well to the deeper zone had you felt disposed to pay a premium price for casing couldn't you? A. Yes, sir."

It is to be noted that other than characterizing the used casing available as "grossly overpriced," "completely out of line with the going price," and "way over the regular prices," defendant did not testify to what those prices were or by how much they exceeded the normal price for the same quality and type of casing.

██ "The fact that compliance with his contract would involve greater expense than he anticipated would not excuse defendant. Parties *sui juris* cannot escape performance of their undertakings because of unforeseen hardship." (*Metzler* v. *Thye,* 163 Cal. 95, 98 [124 P. 721]; see also *Snow Mountain W. & P. Co.* v. *Kraner,* 191 Cal. 312, 325 [216 P. 589]; *Mineral Park Land Co.* v. *Howard,* 172 Cal. 289, 291-292 [156 P. 458, L.R.A. 1916F 1].) ██ Even in the case of a *force majeure* provision in a contract, mere increase in expense does not excuse the performance unless there exists "extreme and unreasonable difficulty, expense, injury, or loss involved." (*Oosten* v. *Hay Haulers etc. Union, supra,* 45 Cal.2d 784, 788; *cf.* 6 Williston on Contracts, rev. ed., § 1968, pp. 5524-5525.) ██ Herein, other than his own characterization of the increased prices above noted, defendant gave the court no factual evidence upon which to base a finding that the increase in price was "extreme and unreasonable." The trial judge was well within his rights in concluding that defendant had not carried the burden of proof in this respect.

3. *Did the proposed modification of the lease affecting the drilling operations estop the demand that defendant pay the required rental?*

Apparently, there was some defect in the property description in the lease which defendant wanted to have corrected. Some time in September, 1956, when Turnbull and Basenberg contacted defendant for the purpose of selling him an adjoining five acres of property, defendant discussed with them the alleged defect in the lease here in question and also the desirability of lessening the required depth of the well from 8,200 feet to 5,000 feet. Defendant's engineer had advised defendant that the shallower well would provide the desired oil production and meanwhile the casing difficulty for the 8,200-foot well would be eliminated. Turnbull and Basenberg stated that they thought they could get the desired modification from the original lessors, and on September 30, 1956, defendant, as above stated, undertook the preparatory work for drilling, which activity the trial court found did not constitute the "commencement of drilling operations" within the meaning of the lease and assignment. Then about November 1, 1956, Basenberg wrote defendant that he could deliver the modification agreement but he would do so only on certain conditions—that (1) rental payments were to be reinstated as of November 1, 1956, with a payment of $3,000 due November 1 and actual drilling in the ground commenced 10 days after de-

livery of the modification or (2) that payment of $3,000 be made on November 1 and thereafter rental would be reduced to $1,500 per month until drilling in the ground was commenced. About November 15 they discussed the modification further but could not reach any settlement, with defendant rejecting the counter proposals and stating that he would have to delay any further drilling until the required casing for the deeper well (8,200 feet) could be obtained.

According to defendant, these circumstances induced defendant to rely on Turnbull and Basenberg to obtain the modification agreement; that he assumed that the shallower well would be permitted as proposed in the modification; that he only did such preparatory work on the property as indicated because he was awaiting delivery of the modification, when he would move on equipment appropriate for drilling the modified well; and that Basenberg and Turnbull certainly could not have had any doubts about his operating ability and financial situation when they were trying to sell him an additional adjoining five acres of property for drilling. This conduct of Basenberg and Turnbull, defendant claims, amounted to an estoppel—defendant's reliance on their representations that the modification agreement would be forthcoming to defendant's injury when he finally had to make the reassignment, causing his loss of $15,970 ($15,000 paid for the assignment and $970 for the preparatory drilling operations).

Plaintiff, on the other hand, counters with the argument that defendant's last-minute activities on the day before the six-month period expired, costing but $970, were only a sham. No further work was done by defendant. According to plaintiff, defendant had no funds available for the required drilling operations here because of his financial obligations on other wells in the same field that defendant was working, and defendant had lost interest in the leased property because defendant's engineer admittedly had advised defendant that a deep well thereon was not a good prospect. Plaintiff also argues that Turnbull and Basenberg were not obligated to secure a modification agreement for defendant; that if they did, they were free to make such conditions as they might wish, which defendant could either accept or reject, but meanwhile his obligations under the assignment stood unaffected.

The trial court found that the alleged defect in the description of the property covered by the lease and assignment was not material and did not require correction before defendant could proceed with the required drilling

operations. It also found that Turnbull and Basenberg obtained the modification agreement as requested by defendant but attached the mentioned conditions, which defendant rejected, and that Basenberg's refusal to agree to any modification without the attached conditions did not prevent defendant from performance of his drilling obligations under the assignment. While it might be argued that the trial court could have found otherwise on the estoppel issue, its finding was made on conflicting evidence and inferences to be drawn therefrom; and its determination of this factual question must be sustained.

We are satisfied that the judgment should be affirmed.

*The Third Party Claim.*

Pursuant to a writ of attachment issued in this action, plaintiff levied on two bank accounts, one standing in the name of defendant individually, with a balance of $1,862.26; and the other in the name of ''Nepple Partnership,'' with a balance of $15,495.95. Nepple Partnerships A, B, C and D joined in one third party claim, alleging that the balance in the Nepple Partnership account was their property. After a hearing the court determined that the money in this account was the separate and individual property of defendant Nepple and ordered delivery of the funds therein to the sheriff to apply toward the satisfaction of the judgment. The only question is the sufficiency of the evidence to support the finding and order.

The four partnerships were limited partnerships with Nepple as general or managing partner and about 140 limited partners in each, for the greater part the same persons. Three partnerships owned rights in one gas well each and the other partnership in two. Nepple was also the general partner in another limited partnership owning a gas lease known as the ''Pedro.'' The receipts from the properties of all of these partnerships, and perhaps others, were received by Nepple, deposited in his personal account and commingled with his own funds. In March, 1957, Nepple opened the account in question and transferred thereto $25,000 from his personal account. He testified that in doing this, he acted on the advice of his auditor, since deceased, that he owed the five partnerships mentioned about $25,000 in the aggregate. No account was set up on Nepple's books so as to reflect this bank account as the repository of any particular funds of any of the several partnerships; and Nepple continued to deposit the receipts for the several partnerships in his own

personal account and, at various times, deposited checks on his personal account in the partnership account. $10,000 was paid from the partnership account to the limited partners in the "Pedro" partnership. An accountant attempted a reconstruction of Nepple's books, from which he testified that the $10,000 paid the "Pedro" partners satisfied the total obligation to them and that the balance in the partnership account at the time of the levy was less than the aggregate amount then due to the four partnership claimants and, in his opinion, represented funds belonging to the four partnerships.

At the time Nepple opened the partnership account he refused a "partnership" signature card, stating that there were no general partners whose signatures were necessary and that he wanted the account in his name only. The account was opened as a fictitious name account, and the card signed by Nepple contained a printed statement that he was the sole owner of the funds deposited. Nepple testified that the funds in the account belonged to the four partnership claimants and the accountant, from his reconstruction of the books (as above noted), expressed his opinion to the same effect.

The burden of proof to establish their title was on the third party claimants[2] and the court could disbelieve the testimony of Nepple as to his intention in opening and maintaining the partnership account. (*Watwood* v. *Steur*, 89 Cal.App.2d 620, 623-624 [201 P.2d 460] ; cf. *Hicks* v. *Reis*, 21 Cal.2d 654, 659-660 [134 P.2d 788].) The form of the account, the fact that it in nowise indicated what, if any, partnership or partnerships may have had title to the funds on deposit, and the failure of the books kept by Nepple to directly reflect an interest of any of the several third party claimants therein were factors properly to be considered, and we cannot say that the trial court was not justified in concluding that the third party claimants had not sustained their burden of proof.

The judgment and order appealed from are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and White, J., concurred.

---

[2] "At the hearing had for the purpose of determining title, the third party claimant shall have the burden of the proof." (Code Civ. Proc., § 689.)