## Pemco Gas, Inc. v. Bernardi

*Frederick L. John, II,* for petitioner.
*Blair F. Green,* for respondents.

HOUSE, *P.J.,* December 30, 1977—Petitioner brings this action for a declaratory determination of its rights under an oil and gas lease held on property located in Cowanshannock Township, Armstrong County, Pa.

## FINDINGS OF FACT

1. Petitioner, Pemco Gas, Inc. (hereinafter referred to as "Pemco") is a corporation engaged in the exploration and production of natural gas with its principal place of business located at Suite 107, 3930 Fulton Drive, Northwest Canton, Ohio, 44718.

2. Respondents, Frank L. Bernardi and Helen G. Bernardi, his wife (hereinafter referred to as "the Bernardis") are individuals who reside at 173 Temona Drive, Pittsburgh, Pa. 15236.

3. Equitable Gas is a corporation with its principal place of business at 420 Boulevard of the Allies, Pittsburgh, Pa. 15219.

4. Robert W. Nichol is an individual engaged in the coal augering business, residing at R.D. 2, Dayton, Pa. Mr. Nichol also engages in the business of performing bulldozer work for hire.

5. S. J. Jack and Son Drilling Company is engaged in the gas drilling contracting business and is located in Indiana, Pa.

6. The Bernardis acquired title to a certain tract

of land situated in Cowanshannock Township by deed dated May 27, 1976, recorded in Armstrong County Deed Book 569, page 302, more particularly described as follows: . . .

7. The Bernardis' title to said land is not in dispute, and an abstract of the title is set forth in plaintiff's exhibits numbers 2, 3, 4, and 5, and in deed attached to Pemco's petition. A dispute as to the Bernardis' title did arise in late August 1976, when Pemco's attorney, Frederick L. John, II, told Pemco that the names appearing in the chain of title, i.e., Harry Lookhart and Harry Lukehart, might not be the same person. This discrepancy is no longer in dispute.

8. The Bernardis' predecessor in title, John Zenchemko, entered into an oil and gas lease with Equitable Gas on September 3, 1966, recorded in Armstrong County Deed Book 501, page 284.

9. The term clause of said lease reads:

"To have and to hold the said land and privileges for said purposes for and during a period of ten (10) years from *September 1, 1966,* and as long after commencement of operations as said land is operated for the exploration or production of gas and oil, or as gas and oil is found in paying quantities thereon, or stored thereunder, or as long as said land is used for the storage of gas or the protection of gas storage on lands in the general vicinity of said land."

10. Said lease was assigned by Equitable Gas to Pemco as evidenced by a letter dated January 20, 1976.

11. The property was surveyed by Pemco to determine the location of the well as evidenced by survey dated May 18, 1976.

12. Pemco made the initial contact with the

Bernardis concerning the drilling of a well early in July 1976.

13. Negotiations between Pemco and the Bernardis continued throughout July 1976.

14. The parties agreed to the location of the well and the location of a right-of-way to the well.

15. Damages to the trees that were to be removed were set at $700 and an oral agreement was entered into that required Mr. Bernardi to be present at the site when any trees were removed in preparing the site. Pemco did not honor this agreement and trees were removed without Mr. Bernardi being present.

16. During July 1976, and the early part of August 1976, Pemco negotiated with Kenneth Yagle, an adjoining property owner, and ultimately obtained a right-of-way across his property to the well site.

17. Pemco employed Robert W. Nichol, who lived near the Bernardis' property, to do the excavation work in July 1976. Nichol worked on the property on August 12, 13, 14, 27, 28, 30, and 31, clearing and grading approximately 11,050 feet of right-of-way and a well site 100 feet by 200 feet, removing 25 to 30 trees in the process.

18. Nichol used a cable to pull down the trees in order to reduce the damages that would be caused to the trees.

19. A drilling rig and equipment could be moved to the site as early as August 27, 1976.

20. Pemco contacted S. J. Jack and Son Drilling Company in early August 1976, to drill the well.

21. Because of delays at another site, Jack and Son notified Pemco that a rig would not be available until the end of August 1976.

22. Jack and Son moved three pieces of conductor pipe to the site on August 30, 1976.

23. A rig was available to move to the site on September 1, 1976, but Jack and Son did not move it to the site because Pemco notified them that the Bernardis had entered into a lease with another party.

24. On August 27, 1976, Pemco received their drilling permit from the State of Pennsylvania.

25. On August 30, 1976, Pemco sent a letter to the Bernardis notifying them of the delays along with a check for $300 for damages caused in clearing the right-of-way and well site. The letter stated that another check for $400 for damages would be on its way.

26. The Bernardis returned the letter and check to Pemco.

27. Pemco did not take any further action regarding operations under the lease after receiving notice from the Bernardis that they had entered into a new lease with Wagner and Wagner on September 1, 1976, and that they regarded the lease assigned to Pemco as having terminated.

28. Pemco would have started drilling a well sometime in August had not certain delays with Jack and Son occurred.

29. Pemco would have continued their operations until a gas well was produced had the Bernardis not leased the property to another party.

30. Pemco did commence operations with the good faith intent to complete a gas producing well.

31. The operations that Pemco did commence prior to the end of the fixed term of the lease were necessary operations conducted in preparation for the actual drilling of a gas well.

## ISSUE

The sole issue before the court in this case is

whether the Pemco oil and gas lease terminated at midnight, August 31, 1976, or whether, by its terms, it continued in effect thereafter.

## DISCUSSION

This court has jurisdiction under the Uniform Declaratory Judgments Act of June 18, 1923, P.L. 840, to determine the proper construction of a lease: 12 P.S. §831 et seq. See also Girard Trust Co. v. Tremblay Motor Co., 291 Pa. 507, 140 Atl. 506 (1928); County Amusement Company v. Johnstown Schiff's, Inc., 37 D. & C. 2d 290 (1965); Rea & Derick, Inc. v. Lancaster Shopping Center, 42 D. & C. 2d 271, 60 Lanc. 191 (1966); 6A Standard Pa. Pract. 365, §120 (1960); 11 P.L.E. 379, §9 (1970). A declaratory judgment may be used in the place of a quiet title action: 11 P.L.E. 382, §10 (1970); Zima Estate, 9 Fiduc. Rep. 676, 50 Luz. 39 (1959).

A great many changes have taken place in the oil and gas industry since its inception in the fields of northwestern Pennsylvania in the latter part of the nineteenth century. The law relating to oil and gas has also been changing, although sometimes lagging behind the times, to reflect new attitudes towards production, conservation and ecology.

The termination of oil and gas leases has been a perplexing problem for decades. The cases involving disputes on termination range from complex interpretation of lease provisions to considerations of the more practical aspects of the oil and gas industry. See 67 A.L.R. 526.

Normally, the lease terminates according to the habendum clause of the lease.

"By the great weight of authority, the term clause, which is the habendum clause, dominates

the period for which the lease shall run, so that unless it is properly modified by other provisions, all rights of the lessee cease at the expiration of the fixed time stated in the term clause, except in the one contingency that at the expiration of such time the lessee is actually producing oil and gas on the premises." Fagan and Co. v. Burns, 247 Mich. 674, 226 N.W. 653, 655, 67 A.L.R. 522, 524 (1929).

In Fagan, the term of the lease was for five years "and as long thereafter as oil and gas, or either of them, is produced from said land by the lessee."

In our case at bar, the term of the lease is for ten years "and as long after commencement of operations as said land is operated for the exploration or production of gas and oil, or as gas and oil is found in paying quantities thereon, or stored thereunder, or as long as said land is used for the storage of gas or the protection of gas storage on lands in the general vicinity of said land."

The law has become fairly clear as to what constitutes "commencement of operations" so that the fixed term can be extended. Summers on Oil and Gas discusses the law at length as follows:

"The modifications of the habendum clause and other portions of the lease so as to provide its extension beyond the primary term by drilling and development operations have taken a variety of forms. A first form is limited to a change in the habendum by the addition of such expressions as 'said premises developed and operated', 'operations are continued thereon' or 'as long after the commencement of operations as said premises are being operated for the production of oil or gas.' These clauses have been construed as meaning that if a lessee commences a well within the primary term of a lease and carries on the drilling

operations diligently and in good faith, although he does not actually complete the well and secure production until after the end of the primary term, the lease remains in force until he completes the well, and if he secures production therefrom, as long as production in paying quantities continues." 2 Summers, Oil and Gas, §300.1, p. 252 (1959).

"In a number of cases it has become necessary for the courts to determine what constitutes commencement of a well or the commencement of drilling operations. Similar language is used in the unless drilling clause and in agreements of leases where the lessee or assignee agrees to commence the drilling of a well on or before a certain date. The general rule is that actual drilling is not necessary and that physical acts normally required to be done prior to the commencement of actual drilling are sufficient, if done in good faith, are sufficient to constitute the commencement of a well or drilling operations. This rule has been followed in the cases involving the habendum and the well completion clauses." 2 Summers, Oil and Gas, §300.1, p. 261 (1959).

"The general rule seems to be that actual drilling is unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona fide intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement of beginning of a well or drilling operations within the meaning of this clause of the lease. If the lessee has performed such preliminary acts within the time limited, and has thereafter actually proceeded with the drilling to

completion of a well, the intent with which he did the preliminary acts are unquestionable, and the court may rule as a matter of law that the well was commenced within the time specified by the lease. On the other hand, where the lessee has taken such preliminary steps within the time limited, but is prevented from continuing the drilling operations by the lessor, then the intent with which these preliminary acts were done becomes material. Where the lessee's good faith in the performance of acts preliminary to the commencement of actual drilling is established by uncontroverted evidence of actual completion of the well with due diligence, or the pleadings of the lessee allege that the preliminary acts were done with the bona fide intent of drilling the well with due diligence, the court may rule as a matter of law that these acts were sufficient to constitute a beginning of operations.

"But if there is doubt or controversy as to the intent of the lessee in performing the acts claimed as a commencement of operations, then the question should be submitted to the jury." 2 Summers, Oil and Gas, §349, pp. 459-66 (1959).

From Summers, it seems clear that two questions arise. First, what kind of preliminary acts are necessary to constitute commencement of operations? Second, and more important, did the lessee commence these operations with the good faith intent to drill a gas well?

### 1. *Commencement of Operations*

The only Pennsylvania case on point seems to be Henderson v. Ferrell, 183 Pa. 547, 38 Atl. 1018 (1898). The Supreme Court upheld the jury's finding that the lessee had commenced operations to drill a well within the 30-day deadline period. On

the last day of the 30-day period, the lessee staked the location of the well and the location of the point where lumber was to be placed. On the same day, the lessee tried to unload lumber on the site but was prevented by the lessor. The court held that this was sufficient to extend the term of the lease.

Although the opinion in Henderson is rather sketchy, we think that the case accurately reflects the law as it is shown by numerous cases in other jurisdictions.

The Michigan case of Walton v. Zatkoff, 372 Mich. 491, 127 N.W. 2d 365 (1964), holds that no actual drilling need be commenced prior to the expiration of the fixed term. There, a lease was entered into for a term of ten years from September 6, 1951. The term was extended if there was a commencement of "operations for the drilling of a well" or "drilling operations." The delay-drilling provision required $40 per year to be paid when drilling was not started.

Several weeks prior to August 31, 1961, a drilling permit was obtained, the site was surveyed and staked, drilling equipment was purchased and a unitization agreement was entered into. On August 31 a bulldozer leveled the site and dug a slush pit. No more operations were conducted until after the fixed term was expired. Then, between September 7 to 13, a drill, derrick and other equipment were moved onto the site. The court said that actual drilling need not start and the above-mentioned activities were sufficient to constitute commencement of drilling operations.

The Texas case of Petersen v. Robinson Oil & Gas Company, 356 S.W. 2d 217 (Tex., 1962), holds that drilling equipment need not be on the premises in order that drilling operations be commenced. In

Petersen, a ten-year lease was entered into on March 27, 1947. A delay-drilling provision provided for twelve month extensions if $244 was paid by the lessee. The lease was to expire on March 27, 1957. Several days prior to the end of the term, the lessee entered into a contract with a driller. On March 26 the site was surveyed. The site was staked and a maintainer was brought in to level the location on March 27. More work was done with the maintainer on March 28 and 29. Between March 30 and April 9 a bulldozer worked at the site and on the road to the site. On April 3 a drilling rig was moved onto the site and work progressed until a well was completed. The court said:

"The record in this case supports the implied findings of the trial court that prior to the end of the primary term of the lease the lessee had set into motion the process of drilling a well, and that such acts preliminary to the actual work of drilling were performed with bona fide intention of proceeding with diligence to the completion of the well." Petersen at 220.

Other similar cases from jurisdictions having substantial drilling activity include: Allen v. Continental Oil Company, 255 So. 2d 842 (La., 1971); Hilliard v. Franz Heim, 180 So. 2d 746 (La., 1965); Jones v. Moore, 338 P. 2d 872 (Okla., 1959); Guleke v. Humble Oil & Refining Co., 126 S.W. 2d 38 (Ky., 1939).

A review of the facts of the case at bar have led us to conclude that Pemco had commenced operations within the generally accepted meaning of that phrase. More than three months prior to the end of the lease, the site was surveyed. This was only a little more than three months after Pemco obtained

assignment of the lease. Almost two months before the end of the lease, Pemco started negotiations with the Bernardis concerning the location of the site, location of the right-of-way and damages. During the same time, negotiations were held with Kenneth Yagle for a right-of-way over his property which adjoined the Bernardis' property. A month before expiration of the lease, Pemco contacted Mr. Nichol to do the excavation work. Shortly after this, Pemco contacted Jack and Son to do the drilling.

The site was prepared during August 1976, and Mr. Nichol testified that a rig could be moved to the site as early as August 27. Jack and Son agreed that a rig would be available in the middle of August, but delays pushed the date to the end of August. A drilling permit was received August 27. Conductor pipe was placed on the site on August 30. The representative of Jack and Son testified a rig would have been moved to the site on September 1 had not Pemco notified them to stop the move. The evidence convinces us that Pemco would have continued with the drilling operations had not the Bernardis leased the property to another party and precluded further entry upon the property.

### 2. *Good Faith*

The second equally crucial question is whether Pemco conducted these preliminary operations with the good faith intent to proceed until a gas producing well was completed.

Cases in several other jurisdictions hold that where preliminary activities to drilling were commenced, but not done or pursued in good faith, the lease could not be extended beyond the fixed term.

Thus, where preliminary acts to drilling were conducted, but actual drilling of the well was con-

tingent upon receiving favorable information from the drilling of a nearby well or upon the making of favorable financial arrangements, the United States District Court in the Eastern District of Texas held that drilling operations were not commenced in good faith: Geier-Jackson, Inc. v. James, 160 F. Supp. 524 (E.D. Texas 1958). Likewise, where preliminary acts were conducted with the hopes that a certain agreement would not be reached, the Supreme Court of Wyoming held that drilling operations did not commence with the good faith intent to drill a well to completion: True Oil Company v. Gibson, 392 P. 2d 795 (Wyo. 1964). Similarly, the Supreme Court of California held that, where completion of the well was conditioned upon buying pipe at a favorable price, no good faith could be found. This was true in light of the fact that the lessee drilled two costly wells just prior to the expiration of the lease in dispute: Butler v. Nepple, 54 Cal. 589, 6 Cal. Rptr. 767, 354 P. 2d 239 (1960). And even when the well had been spudded in, i.e., actual drilling had started, the Court of Appeals of Kentucky held that good faith commencement of operations could not be found where the lessee then abandoned the operations for several months before resuming activities: Flanigan v. Stern, 204 Ky. 814, 265 S.W. 324 (1924).

The Bernardis did not present any evidence to show lack of good faith on the part of Pemco in commencing drilling operations. The only evidence that they did present leads to the possible inferences to be drawn from the facts that Pemco breached its agreement with Mr. Bernardi in that he was to be present at the site when any trees were pulled down and that operations were not commenced until near the end of the ten-year term.

The agreement with Mr. Bernardi was simply an accommodation on the part of Pemco and collateral to the parties' rights and duties under the lease. Pemco had the contractual right to drill a well on the property under the lease and was required to use ordinary and reasonable care in conducting its operations. The evidence shows that the parties had agreed on the location of the right-of-way and the site. Mr. Nichol testified he used special care in pulling down the trees when clearing the right-of-way and site. Mr. Bernardi would not say he was displeased with the job, but he felt that a few trees out of 25 to 30 pulled down were damaged. Even though the Bernardis may have a valid legal claim' for damages because of the breach of this collateral agreement, we do not feel that this shows any lack of good faith on the part of Pemco in commencing operations.

The Bernardis argue that the lessee did not start operations with due diligence because it was only near the end of the ten-year lease that the operations started. Both Walton, supra, and Robinson, supra, involved ten-year leases. In both cases, activities did not start until near the end of the ten-year term. And, in both cases, the courts found that the operations then conducted extended the fixed term of the lease.

The lease in this case also has a delay-drilling provision providing for compensation of $5 per quarter if a well is not previously completed. "Where the lease contains either of these provisions [the drill or pay or the 'unless drilling commences' clauses] for delay in drilling, most courts have held that such express provisions preclude the implication of a duty in the lessee to drill within a reasonable time, although in a few jurisdictions it has been held that the lessee is under a duty to drill within a

reasonable time after notice." 2 Summers, Oil and Gas, §413, p. 601 (1959).

The changing nature of the oil and gas industry has brought about a new approach to the old concept that production should be sought with due diligence.

"It was through this formative period of oil and gas law when the policy of production was predominant, that certain so-called rules of construction of oil and gas leases were created. These rules have continued in the language of the decisions, although the policy upon which they were founded has been greatly weakened by the counteracting policies, which may for convenience be termed the policy against over-production, or economic waste, and the policy of conservation of natural resources." 2 Summers, Oil and Gas, §372, p. 483 (1959).

Several factors may have caused some delay in the operations. These include the negotiations with Yagle concerning a right-of-way over his property, the possible title defect in the Bernardis' title, and unforeseen delays in moving the drilling rig. But the evidence shows that none of the factors were regarded as preconditions to completion of a well or to the drilling operatons so as to negate Pemco's good faith.

Thus, we cannot see anything that suggests bad faith on the part of the lessee in commencing operations.

The Bernardis allege that a tenancy at will should be created at the end of the ten-year term of the lease, citing the following cases in support of their view: Clark v. Wright, 311 Pa. 69, 166 Atl. 775 (1933); Cassell v. Crothers, 193 Pa. 359, 44 Atl. 446 (1899); T. W. Phillips Gas and Oil Company v.

Komar, 424 Pa. 322, 227 A. 2d 163 (1967); White v. Young, 409 Pa. 562, 186 A. 2d 919 (1963); Brown v. Haight, 435 Pa. 12, 255 A. 2d 508 (1969). In these cases, the fixed term of the lease was extended only if gas or oil was found or produced in paying quantities. Gas or oil was not found or produced in any of the cases cited above. Thus, the courts held that a tenancy at will was created.

However, the case at bar is clearly distinguishable. Here, the lease will be extended beyond the fixed term if operations connected with drilling a well are commenced before the fixed term expired. The very contingency extending the term of the lease which did not take place in the cases cited by the Bernardis did take place in the case at bar.

## CONCLUSIONS OF LAW

This court is of the opinion that the lease did not terminate on August 31, 1976, but that it was extended by Pemco's good faith commencement of operations in preparation for the actual drilling of a gas well within the fixed term of the lease.

A few words of caution must be added. The evidence clearly shows that Pemco would have continued operations to drill a gas producing well but for the Bernardis signing a lease with another party. The same good faith and unconditional activity must also persist if Pemco elects to continue operations. Although consideration should be taken of the delays caused by this litigation, Pemco must make a diligent effort to complete a well on the Bernardi property within a reasonable time.

## ORDER

And now, December 30, 1977, upon considera-

tion of the petition for declaratory judgment and answer thereto, and upon consideration of the evidence adduced at hearing and the oral and written argument of counsel, and, for the reasons contained in the annexed opinion, it is ordered, adjudged and decreed that the certain gas lease entered into between John Zenchemko, as lessor, and Equitable Gas Company, as lessee, dated September 3, 1966, and recorded in Armstrong County Deed Book Vol. 501, page 284, did not terminate on August 31, 1976, by operation of law or otherwise, but remains in full force and effect so as to bind the parties thereto, their heirs, successors and assigns.

Each party to bear own costs.