J. A29013/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

DANIEL L. HEATH, : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellee :
:
v. :
:
GEORGE D. DELLICH AND MARY ANN :
DELLICH, :
:
Appellants : No. 239 WDA 2016

Appeal from the Judgment February 8, 2016[1]
In the Court of Common Pleas of Venango County
Civil Division at No.: 848-2011

BEFORE: DUBOW, J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.: **FILED DECEMBER 13, 2016**

Appellants, George D. Dellich and Mary Ann Dellich, appeal from the

February 8, 2016 Judgment entered after a bench trial in this oil and gas

lease dispute. Upon review, we affirm.

We adopt the facts as set forth by the trial court in its October 7, 2015

Findings of Fact pursuant to Pa.R.C.P. No. 1038. **See** Trial Court Opinion,

10/7/15, at 1-19. We, therefore, reiterate only the facts relevant to the

instant appeal. In 1982, Appellants, landowners of 59 acres in Venango

---

[1] Appellants purport to appeal from the January 28, 2016 Order denying their Post-Trial Motions. Appellants filed a Praecipe for entry of Judgment on February 8, 2016. **See** Pa.R.C.P. No. 227.4; **Prime Medica Assocs. v. Valley Forge Ins.,** 970 A.2d 1149, 1154 n.6 (Pa. Super. 2009) (holding that Orders denying Post-Trial Motions are interlocutory and generally not appealable; rather, the subsequent Judgment is appealable). We have changed the caption accordingly.

County, Pennsylvania, and the Peoples Natural Gas Company entered into an

Oil and Gas Lease.

> The relevant portions of the lease provided as follows:
>
> 2. TERM. It is agreed that this lease shall remain in force for the term of five (5) years from April 2, 1983 and as long thereafter as the above described land, or any portion thereof or any other land pooled or unitized therewith as provided in paragraph 3 hereof is operated by the Lessee in the search for or production of oil or gas or as long as gas is being stored, held in storage, or withdrawn from the premises by the Lessee.  Upon the drilling of a well upon the premises, or any portion thereof, or any other land pooled or unitized therewith, yielding no royalty, the Lessee may continue to hold the leased premises, upon the continued payment of the delay rental hereinafter provided for a further term of five (5) years after the expiration of the term above mentioned and as long thereafter as the land, or any portion thereof or any other land pooled or unitized therewith, is operated by the Lessee in the search for or production of oil or gas.
>
> *     *     *
>
> SHUT IN ROYALTY: If any well or wells, on the leasehold or acreage unitized therewith, are capable of producing gas and are shut-in and no gas is produced and there are no other production or drilling operations being conducted, or payments made under any other provision of this lease to maintain the lease in force, Lessee covenants and agrees to pay a royalty at the rate of [$29.50], quarterly in advance, beginning ninety (90) days from the date any well or wells are shut-in and each three months thereafter during the shut-in period.

Oil and Gas Lease, 12/2/1982, at 1.

In 1987, the Peoples Natural Gas Company pooled Appellants' land with 17 other leases and 13 tracts of land, and drilled K. Greene #1 Well into Medina sand to a depth of 6,700 feet ("Well #1").

In January 2000, Appellee acquired the Peoples Natural Gas Company's rights under the original lease by Assignment and continued to operate the Well. In 2002, Well #1 ran into problems involving a salt bed embedded near the Well, which dramatically decreased the amount of gas produced. In 2005, due to similar salt bed issues, Well #1 collapsed.

The Well stopped producing gas in April 2008. Under a provision of the original lease, if the Well yielded no royalty payments Appellee could extend the lease for 5 years by paying a "delay rental," also referred to as a "shut-in royalty payment." Beginning in February 2009, Appellee provided these payments every three months in the amount of $29.50, accompanied by letters to assuage Appellants' concerns. Appellants cashed the checks until February 2011 when they began returning the checks. Appellee then placed the checks in escrow from and after that date until July 2011.

In March 2010, the Pennsylvania Department of Environmental Protection ("DEP") issued a Notice of Violation after an inspection indicated the Well was abandoned.[2] Appellee contacted DEP in August 2010 to request additional time to bring the Well into compliance in order to conduct evaluation and testing. DEP granted him 90 additional days. In November

---

[2] The trial court stated that the DEP characterized the well as abandoned "in compliance with its regulations" pertaining to non-producing wells that are not plugged. Trial Court Opinion, 10/7/15, at 26.

2010, Appellee filed an Application for Inactive Well Status, which DEP denied in December 2010.

In February 2011, Appellee sought advice from Thomas Havranek ("Havranek") regarding his options to repair the collapsed Well #1, and the two spoke about the project every 6-8 weeks. Havranek prepared a list of five options to fix the Well. DEP again inspected Well #1 in March 2011 and concluded that it was still abandoned. In May 2011, Appellee plugged Well #1.

In June 2011, Appellants sent a letter to Appellee terminating the lease due to the lack of production and activity. On July 15, 2011, Appellee initiated the instant action by filing a Complaint to quiet title and for declaratory judgment. The trial court denied summary judgment.

Also in July 2011, Appellee submitted an application to DEP for a sidetrack procedure.[3] Although DEP granted Appellee's application, Appellee abandoned the sidetrack in September 2011 after further consultations and endangered species concerns. Instead, in October 2011, Appellee applied for a permit to drill an alternate Well ("Well #2"), which DEP granted in

---

[3] The sidetrack procedure involved plugging the existing vertical Well with cement above the problematic area, and then drilling laterally into the side of the existing Well from that point to a similar total depth "to correct the deficiencies in the existing [W]ell[.]" Trial Court Opinion, 10/7/15, at 8; Letter from Havranek to DEP, 7/8/11, at 1.

November 2011. Appellee drilled Well #2 in March 2012, and Well #2 began producing in November 2012.[4]

Following a bench trial conducted on September 10-12, 2015, the trial court rendered its written verdict in favor of Appellee on October 7, 2015, granting the declaratory judgment and confirming title with respect to the lease in Appellee.

After the denial of their Post-Trial Motion, Appellants filed a timely Notice of Appeal. Appellants and the trial court complied with Pa.R.A.P. 1925.

Appellants present four issues for our review:

1. Did the trial court err as a matter of law when it concluded the burden of proof was initially on the Appellants in both the Quiet Title Action and the Declaratory Judgment Action?

2. Did the trial court err as a matter of law or abuse its discretion by finding in favor of Appellee?

3. Did the trial court err as a matter of law when it determined that Appellee was tendering a valid shut-in payment?

4. Did the trial court err as a matter of law or abuse its discretion by utilizing an Exhibit that was not admitted into evidence?

Appellants' Brief at 4.

Our standard of review in a declaratory judgment action "is limited to determining whether the trial court clearly abused its discretion or

---

[4] Appellee expended approximately $400,000 to get Well #2 into production, as well as $300,000 for a compression facility completed in 2013 to create a market for gas from the Well. Trial Court Opinion, 10/7/15, at 8, 10, 25.

committed an error of law." ***Peters v. Nat'l Interstate Ins. Co.***, 108 A.3d 38, 42 (Pa. Super. 2014). "We may not substitute our judgment for that of the trial court if the court's determination is supported by the evidence." ***Id***.

In reviewing a trial court's decision in a non-jury trial, we are mindful of the following precepts:

> Our review in a non-jury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the non-jury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

***Kennedy v. Consol Energy Inc.***, 116 A.3d 626, 640 (Pa. Super. 2015) (citation and quotation marks omitted).

"[A] lease is in the nature of a contract, and [it] is controlled by principles of contract law." ***T.W. Phillips Gas and Oil Co. v. Jedlicka***, 42 A.3d 261, 267 (Pa. 2012) (citation omitted). "[T]he object in interpreting instruments relating to oil and gas interests, like any written instrument, is to ascertain and effectuate the intention of the parties." ***Szymanowski v. Brace***, 987 A.2d 717, 720 (Pa. Super. 2009) (citation and quotation omitted).

A lease must be construed in accordance with the terms of the agreement as manifestly expressed, and "the accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *Jedlicka*, *supra* at 267 (citations omitted). "This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation." *Szymanowski*, *supra* at 722 (citation omitted). "[A] party seeking to terminate a lease bears the burden of proof." *Jedlicka*, *supra* at 267 (citation omitted).

In *Jedlicka*, the Supreme Court of Pennsylvania held that "if a [W]ell consistently pays a profit, however small, over operating expenses, it will be deemed to have produced in paying [q]uantities." *Id*. at 276. In that case, the lessor argued that "because there was a $40 loss in 1959, the subject [W]ells failed to produce in paying quantities, resulting in termination of the lease." *Id*. The *Jedlicka* Court rejected this argument and affirmed the trial court's finding that a one-year period in the context of a 80-year-old lease was not an appropriate time period for evaluating profitability. *Id*.

In their first issue, Appellants aver that the trial court improperly placed the burden of proof on them as defendants in the underlying matter. Appellants' Brief at 14. Appellants acknowledge that they could not locate any Pennsylvania oil and gas lease case, "where there was a challenge regarding the burden of the moving party[.]" Appellants' Brief at 15.

Instead, Appellants cite several Ohio cases and mischaracterize the trial court's actions and decision by arguing that "[t]he trial court seeks to shift this requirement to [Appellants], without first requiring a showing of *prima facie* title by [Appellee.]" Appellants' Brief at 17.

The trial court relied on our Supreme Court's decision in **Jedlicka**, **supra**, and concluded "that once it is established that a [W]ell has been produced and that the lease has been in production, [] the burden then is on the landowner, and not the producer, to demonstrate that the lease is no longer in production." Trial Court Opinion, 10/7/15, at 22. The trial court then concluded that Appellee satisfied this *prima facie* showing and that Appellants failed to meet their burden of proof. We agree with the trial court and conclude that the trial court properly applied the applicable burden of proof.

In their second issue, Appellants aver that the trial court generally abused its discretion and erred as a matter of law when it ruled in favor of Appellee. Appellants chiefly contend that the trial court fundamentally misapplied the concept of good faith set out in **Jedlicka**, **supra**, which permits the trial court to examine economic determinations and business judgments when evaluating whether the leaseholder has exercised good-faith efforts to maintain the lease. Appellants contend that **Jedlicka** applies only to determinations of "what constitutes production 'in paying quantities' sufficient to maintain a leasehold[]" where a Well has continuously

produced. Appellants' Brief at 21. Appellants aver that, because Well #1 stopped producing, a different good-faith standard that did not examine economic determination and other business determinations is more appropriate.

Appellants specifically direct our attention to the good faith standard set forth in ***Pemco Gas, Inc. v. Bernardi***, 5 Pa. D. & C.3d 85 (Pa Com. Pl. Ct. 1977), and argue that the Armstrong County Court of Common Pleas properly took into account diligent actions and actual "operations [but] not [] economic decisions." Appellants' Brief at 24; ***see also*** Appellants' Reply Brief at 2-3. Appellants believe applying this alternative standard would alter the legal conclusions in the instant case, and generally challenge the trial court's findings of fact and conclusions of law.

As an initial matter, the trial court properly relied on ***Jedlicka***, ***supra***, which constitutes binding precedent. ***Pemco***, ***supra***, a decision of a Court of Common Pleas, is not binding precedent for this Court or another Court of Common Pleas. ***Sysco Corp. v. FW Chocolatier, LLC***, 85 A.3d 515, 520 n.2 (Pa. Super. 2014) ("It is well-settled that Court of Common Pleas decisions 'are not binding precedent for this Court[,]' … [but] may be considered for their persuasive authority."); ***see also Castle Pre-Cast Superior Walls of Delaware, Inc. v. Strauss-Hammer***, 610 A.2d 503, 505 (Pa. Super. 1992) (holding trial court decision from a different county did not constitute binding precedent).

Based on our review of the certified record, we conclude that the findings of the trial court are supported by competent evidence and the court did not err in its application of precedential law. As a result, we will not disturb the trial court's reasonable conclusions.

In their third issue, Appellants aver that the trial court improperly concluded that Appellee had provided valid "shut-in payments" between 2009 and 2011 to extend the oil and gas lease under the "Shut In Royalty" section. Appellants' Brief at 33. They argue that "the [W]ell was not capable of producing gas after April 17, 2008[,]" and the shut-in payment provision could not apply because that provision of the lease states that the well must be capable of producing gas. Appellants' Brief at 34.

As quoted above, the original oil and gas Lease provided for Shut In Royalty payments. The trial court addressed this issue as follows:

> It was a bone of contention whether the payments were for "shut-in" royalty or for some other intention. [Appellee's] contention [was that they were] for shut-in royalty and he so testified repeatedly. Defense counsel's position is that such language flaunts the language of the lease. We conclude that [Appellee] made the payments in good faith in an effort to demonstrate to the lessees that he was fully intending to maintain the well in operation, which was the subject of the lease.

Trial Court Opinion, 1/28/16, at 4.

Appellants misread the relevant provision of the oil and gas lease in constructing their argument. Upon examining the terms of the lease and the trial court's Opinions, the validity of the payments under the "Shut In

Royalty" section was not at issue. Rather, the issue centered on the "Terms" section of the lease, which examined whether Appellee operated the land "in the search for or production of oil or gas." Oil and Gas Lease, 12/2/1982, at 1.

Appellants also mischaracterize the trial court's findings and conclusions. The trial court concluded that the payments made to Appellants constituted circumstantial evidence of Appellee's good faith efforts to maintain the lease when examined in light of the totality of the circumstances, including the letters accompanying the payments attempting to assuage Appellants and Appellee's good-faith efforts to get Well #1 running again. The trial court did not resolve the issue of whether the payments constituted valid "shut in royalty" payments.

Moreover, the trial court pointed out that Appellants accepted the payments from February 2009 through February 2011. When they began returning all payments to Appellee, Appellee deposited these payments in escrow until July 2011. Trial Court Opinion, 10/7/15, at 7. The trial court could reasonably rely on these payments to Appellants, along with the letters and attempts at repairs, to support its conclusion that Appellee acted in good faith to maintain the lease under the "Terms" section of the lease. As a result, we will not disturb the trial court's reasonable conclusions.

In their fourth issue, Appellants aver that the trial court improperly relied on an exhibit that was not admitted into evidence at trial. The

evidence at issue is Exhibit 26, a letter Havranek sent to DEP in April 2011. The trial court acknowledged the letter in its timeline of events in its formal decision and findings of fact. **See** Trial Court Opinion, 10/7/15, at 18. Appellants' argument has no merit.

The trial court addressed Appellants' challenge as follows:

[Appellants] note[] that Exhibit 26 was never admitted into evidence; therefore, it was error for the trial court to rely upon the same. The discussion on the record as to Exhibit 26 is in the transcript Pages 281 to 291 and occurs during the testimony of Mr. Havranek. [Appellants'] counsel initially, as we discussed the admissibility of Exhibit 26, agreed it was admissible and did not object; however, once it was established that Exhibit 26, which was a transmittal letter to DEP, also contained enclosures and there was some dispute as to what the enclosures contained and also as to whether or not DEP even received the letter, counsel for the [Appellee] withdrew Exhibit 26 and Exhibit 26 was not received into evidence. [However,] [w]hen counsel for [Appellee] withdrew Exhibit 26 he said that he was satisfied that the record showed that the letter, which was dated April 17, 2011, was, in fact, sent and was mentioned to show activity and that he did not need to have in evidence the substance of the letter. **We are treating the record as establishing that on April 17, 2011, a letter was sent from Havranek to DEP but the contents of the letter were not received into evidence.** Whether this letter was sent or not is not very material to the overall disposition of the case.

Trial Court Opinion, 1/28/16, at 46 (emphasis added).

Our review of the record indicates that Appellant did not object to the admission of the fact of the existence of the letter. Appellants have waived this claim by failing to specifically object and present this argument to the trial court. **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Moreover, we note that "[t]he admissibility of evidence is a matter addressed solely to the discretion of the trial court and may be reversed only upon a showing that the court abused its discretion." **Klein v. Aronchick**, 85 A.3d 487, 491 (Pa. Super. 2014). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." **Id**.

Our review of the certified record confirms the trial court's summary of events. While the trial court granted Appellants' Motion to strike the contents of the letter and any attachments, the trial court admitted the testimony about the existence of the letter Havranek sent in April 2011. As a result, the trial court could properly reference the letter in its timeline based on Havranek's actual testimony about the letter. We discern no abuse of discretion or error under these circumstances.[5]

As a result, Appellant's fourth claim merits no relief.

The parties are instructed to attach a copy of the trial court's Opinions dated 10/7/15, 1/28/16, and 3/24/16, to all future filings.

Order affirmed.

---

[5] In addition, even if there had been error, Appellants suffered no prejudice or harm. As the trial court noted, the letter was inconsequential given the other evidence upon which the court relied.

J. A29013/16

- 14 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/13/2016

```
DANIEL HEATH,               :   IN THE COURT OF COMMON PLEAS
      Plaintiff             :   VENANGO COUNTY, PENNSYLVANIA
                            :
      v.                    :
                            :
GEORGE DELLICH and          :
MARY DELLICH,               :
      Defendants            :   CIV. NO. 848 - 2011
```

## FINDINGS OF FACT

We have for consideration the nonjury trial where this Judge is acting as trier of fact on the dispute relating to whether or not the gas operations of the Plaintiff, in the Borough of Barkeyville, Venango County, Pennsylvania, should be terminated consistent with the notice mailed to the Plaintiff by the Defendant.

This case arises when the Defendants in this case, George and Mary Dellich, hereinafter Defendants, sent notice, on June 9, 2011, to Daniel Health, hereinafter the "Plaintiff" that the oil and gas lease was terminated. The Plaintiff, thereafter, on July 15, 2011, filed a Complaint in Quiet Title and Declaratory Judgment.

The matter went through the pleadings and was addressed by the Court in summary judgment. Summary judgment was denied.

The case was scheduled for four days of testimony; however, the parties were able to get their cases in with two days of testimony and an additional day to allow for submitting proposed findings of fact and argument.

1

Plaintiff's counsel has submitted proposed findings of fact, and defense counsel submitted proposed findings of fact at the commencement of the trial and then submitted supplementary findings of fact the day before final argument. Defense counsel also submitted rebuttal findings of fact on the morning of argument. All of the filings were consistent with the direction of the Court.

The Court heard from six witnesses on behalf of the Plaintiff, and one witness on behalf of the Defendants.

Premises are in the Borough of Barkeyville, which is the southern portion of Venango County, very close to Interstate 80. The oil and gas lease, dated December 2, 1982, involved People's Gas and the Defendants. On July 24, 1983, a pooling agreement was provided for six leases. The pooling involves about 633 to 635 acres. The acreage would be mostly in Irwin Township, Venango County, Pennsylvania with some activity in Barkeyville Borough.

The original well was drilled within two years of 1982, and the original well was called the Kenneth Greene No. 1. It was drilled to the Medina sand approximately 6,700 feet deep.

The Plaintiff, Mr. Heath, purchased the gas leases on September 16, 1992. The leases had been transferred to Cabot Oil, and in September of 1992, Cabot assigned the leases to

2

Ironwood, Inc., which is a company owned entirely by the Plaintiff.

On January 1st of 2000, the Plaintiff assigned the lease from Ironwood, Inc. to himself.

The lease was inactive, under Cabot, for a period of about five years, extending from August 30, 1989. Heath extended the inactive status one year, on August 19, 1994. Per Exhibit 24, there are issues with the well collapsing in 2003, and the Plaintiff attempted to repair the Ken Greene Well No. 1, hereinafter "Greene No. 1," in March of 2008.

And by the pleadings and the evidence, the parties concluded the well was not producing and had not produced during the relevant period, after April 13 or April 17, 2008.

The last letter with royalty check to the Defendants from the Plaintiff, Exhibit 72, was sent in June of 2008.

The first witness called by the Plaintiff was Shawn Speedy. Mr. Speedy is a consultant involved in drilling for oil and gas, and Mr. Speedy was engaged to assist the Plaintiff in deciding how to cure the problem of the blocked well (Greene No. 1).

Mr. Speedy explained the circumstances under which he was brought to the premises and explained that at some point, as the new well was being drilled, there was a collapse of some of the pipes in the well and he was required to use his expertise to assist the driller in retrieving the piping that was separated

3

and dropped into the bottom of the well. This term is called "fishing".

The Plaintiff called the Defendant, George Dellich, as on cross-examination. Mr. Dellich acknowledged that he and his wife had no specific issues with the driller. They had never had any conflicts with him, but concluded that they wanted out from under the oil and gas lease.

The Plaintiff, Dan Heath, testified at substantial length, and his testimony we will summarize. Mr. Heath is generally in the oil and gas business. He has several other oil and gas wells independent of the well in question. He owns and operates a company called Heath Oil, which is a wholesale oil products company.

At the time he first investigated this well and considered purchasing it, Mr. Heath had been made interested in the well by Mr. Havranek. Mr. Havranek is an oil and gas engineer and produces many oil and gas wells in the area. His place of business is in New Castle, Pennsylvania. And he did testify, and we will be discussing Mr. Havranek more thoroughly in this opinion.

The well had been drilled in 1987, and at the time, in 1992, that Mr. Heath purchased the well, it was producing 1,700 pounds of pressure. He paid $75,000 for the well and the lease. He testified the well is 6,700 feet deep, that he had a tender

4

1239a

for the well, Ben Hostettler, Mr. Hostettler was involved in a bad car accident and left his employment.

The well in question is not on the Defendants' property. Rather, the well is on Mr. Greene's property, and there are about five different properties pooled, as we have already noted, totaling about 635 acres. Of which, the Plaintiff's portion is about 80 acres.

Initially the well, when he took it over, was not producing because it did not have infrastructure to get the gas to a buyer. Mr. Heath ran a line to Frank's Truck Wash, in Barkeyville, and the well was supposed to provide gas service to Frank's Truck Wash. Also, the well was run to a home, Bill Corson, Sr.

Atlas Energy drilled two wells in the vicinity of the well in question. And he negotiated with Atlas to sell Atlas some gas from the well, and, therefore, a pipeline was built to the east to connect to Atlas's lines.

The arrangement with Frank's Truck Wash did not work out because the truck wash needed a constant, steady supply of gas and the one well was not sufficiently reliable, and, therefore, the arrangement with Frank's Truck Wash ended.

Barkeyville has no public utility gas service.

Mr. Heath engaged Mr. Havranek as an engineering consultant. At that time the pressure was below 500 pounds, and

5

it was determined there was a 633-foot salt dome below the surface where the well was drilled.

They attempted to cure the issues with the pressure by pouring fresh water down the casing to dissolve the salt. That seemed to improve the production for some period. It was surmised that the water drilling, where there are salt caverns, the salt becomes malleable and it facilitates crushing of the line because the cement casing of the line does not protect it.

Mr. Heath told us he became concerned about the well's production in 2005, attempted to pull the tubing, also tried pouring fresh water down the line. He said the technology is such that if the well were drilled today, they would not use water because of the salt; as they now use air. Apparently water causes the salt to become malleable and creates caverns.

From 2005, Mr. Heath testified that he was attempting to come up with a game plan on how to fix the well.

He was advised, by DEP, to apply for inactive status. However, when he applied for inactive status, which was on November 15, 2010, the application was refused on December 22, 2010. And it was refused because the well had been on inactive status one other time, and, apparently, it is a DEP policy that wells may not be placed on inactive status more than one time.

Mr. Heath testified that, at very substantial cost, he built a compression station at Barkeyville, and the gas is put

6

into containers and they sell the gas to vehicles at the compression station. He stated the compression station with connecting lines to the well cost $300,000. He activated the pipeline between the gas well and the processing plant. He also explained that they have 7 million BTU heaters running natural gas, and that, in doing this, he had created a market for gas from the well.

The work on the compression facility was completed in 2013. Mr. Heath explained he had a difficult time getting the compression station completed because he had to wait forever for parts.

There were 10 letters between February of 2009 and July of 2011 from the Plaintiff to the Defendants where he sent them checks of $29.50 for "shut-in fees". The first letter, February 19, 2009, explained to the Dellichs that he was having problems with the Greene No. 1 well, that it was not producing, and that they were working to fix it. The Defendants accepted the checks up to February of 2011, and then the Defendants stopped accepting the checks and returned them to the Plaintiff. The Plaintiff then escrowed the checks, and the Defendants' money is in escrow. The royalty checks are also in escrow from and after that date.

As we have noted, the Defendants, through counsel, sent a notice of termination on June 9th of 2011 (Exhibit No. 3).

7

1242a

On February 16, 2011, Tom Havranek, who the Plaintiff engaged as a consultant, wrote a memorandum, which is in evidence as Exhibit 16. In the letter, Mr. Havranek proposed different alternatives on how to address the problem with the well not producing. The one alternative was to drill a well alongside the existing well; another was to drill in such a fashion as to correct the deficiencies in the existing well; and there were other alternatives such as drilling Marcellus-type wells with the lateral production. Marcellus wells were expensive, perhaps as much as $2 million.

Ultimately the Plaintiff chose the first option, which was to drill a well alongside of Greene No. 1, and that well became Greene No. 2. Well No. 2 was permitted on November 21, 2011, and was drilled over a space of four or five days in March of 2011.

The Ken Greene well No. 2 continues to produce. Nobody questions that its production, at this time, is not in paying quantities.

To drill and hydrofracture the new well and get it operating, the Plaintiff expended about $400,000.

Mr. Heath testified that as he was consulting with Mr. Havranek, his object was to get a well into production as soon as possible. In order to get the well into production, they had

8

to apply for a permit. It takes DEP about 45 days to issue a permit.

In the course of applying for the new well, they ran into an environmental issue with endangered Black Massasauga Rattlesnakes, but Mr. Havranek testified he was able to get a clearance on the environmental issue as to the rattlesnakes in a reasonable period of time.

The issue for the Plaintiff as to whether he was going to attempt to correct the existing Greene No. 1 or drill a new well was, he characterized as, a difficult decision because it would require getting permits for the new well; whereas, he would not require permits to "sidetrack" the existing well. The problem was that sidetracking did not appear to be a consistently successful approach, as nobody really knows what is going on under the ground. So Plaintiff opted to drill the new well because of the more modern technology in drilling at that time. Based upon the estimates and assessment of Mr. Havranek, it was more of a sure thing than to sidetrack and certainly cheaper than the Marcellus drilling (Exhibit No. 16).

Plaintiff had trouble getting a drilling company to come in and drill since he was only drilling one well, and at the time of the drilling oil and gas wells was very active in the area. There was a huge Marcellus boom, oil drillers were in very high demand, and he had to wait several months for Union Drilling to

9

bring a drilling rig in and drill the well. The well was finally drilled in 2012.

The gas from Ken Greene 2 is now being delivered to the processing station in Barkeyville. Plaintiff attempted to sell the gas through the pipeline to the Atlas line to Chevron -- Chevron has in the interim purchased Atlas -- but Chevron had no interest in buying the gas. The evidence adduced that over the last year and half the bottom has fallen out of the gas market because of the vast quantity of gas now available because of the Marcellus production boom. Gas prices presently are extremely low.

Mr. Heath did plug Greene No. 1, consistent with the directions of the DEP.

The cost of fishing the lost line out of the second well was about $50,000. Mr. Heath did write to Mr. Willy, on August 10, 2010, to discuss with him the issues concerning Greene No. 1. On November 21, 2011, Mr. Heath's notes, which is Exhibit 18, show that he was actively pursuing alternatives on either repairing Greene No. 1 or drilling a new well. Mr. Heath testified he was having problems with Greene No. 1 beginning in 2005. Based upon his consultation with Mr. Havranek, Mr. Speedy, and Mr. Willy of DEP, they attributed the casing collapse issues to the sand cone or the salt cone. And that problem extended up to when the well finally quit producing in April of 2008.

10

1245a

Mr. Heath acknowledged receiving the Defendant's attorney's letter terminating the lease, in June of 2011, but he credibly insists his intent always has been to get the well back into production.

On cross-examination, Mr. Heath acknowledged that on February 19, 2009, at a deposition, he acknowledged that he was paying shut-in royalties. Explained that at the time he was paying shut-in royalties, he did not know at that time how or whether he would be able to repair Greene No. 1. The constant dilemma was to either repair Greene No. 1 or plug it and drill a new well, using modern technology, near it.

It is noted that DEP sent Heath notices in February of 2010, May of 2010, and March of 2011, wherein DEP surmised that Greene No. 1 had been abandoned. The DEP's, we find, contention that the well had been abandoned was based on the fact that there had not been production since April of 2008.

On May 10, 2011, a slip line, which is a test wire dropped down the well, was dropped down the well to determine at what point the line encountered the crushed casing, which would be crushed by the sand preventing the cement from protecting the casing, and the crush was found at about 5,267 feet. As we have already stated, the well was in the Medina sand at about 6,700 feet deep.

11

1246a

Mr. Willy sent reports, on May 23rd of 2011 and May 24th of 2011.

The permit to drill or alter a well was issued on August 31, 2011.

The Pennsylvania Fish and Boat Commission gave the approval on the well, notwithstanding the issue of the endangered Massasagua Rattlesnack on August 25, 2011.

The parties essentially agreed that there was no capability of production between April of 2008 and when Greene No. 2 came on line in November of 2012. During cross-examination, Mr. Heath testified there may have been some production after April of 2008, but whatever production occurred after April of 2008 was not meaningful production

$29.50 was to be paid to the lessors as shut-in royalty every three months. Greene No. 1 was plugged on May 25, 2011. Greene No. 2 was drilled and completed in March of 2012. A completion permit was filed July 12, 2012. The well was in production on and after November of 2012, see Exhibits No. 18 and Z.

Thomas Havranek testified on behalf of the Plaintiff. Mr. Havranek was not offered as an expert; however, he is an engineer who is very much involved in the oil and gas industry and has drilled or supervised the drilling of thousands of oil

12

and gas wells.  He is partner of the Plaintiff in other oil and gas wells.

Mr. Havranek acknowledged that in about 1982 he had brought Mr. Heath's attention to the Greene No. 1 in the first place and that he did consult with Mr. Heath throughout the operation of Green No. 1.  He explained that, in 2008 and 2009, he was very busy with his own drilling company.  When discussing with Heath the problem with the well, he surmised it was probably related to the salt ring and that salt rings in that location were a constant problem because they caused the well casing to collapse.

He acknowledged that during that period Mr. Heath kept the well going for a brief period by pouring water down the line. He stated that he and Mr. Heath conferred about every six weeks, beginning in 2005.

He discussed the five options to resolve the problems he presented in writing to Mr. Heath on February 16, 2011. (Exhibit No. 16).

At Mr. Heath's direction, he did obtain the permits to drill Greene No. 2.

He also engaged Universal Well Service to assist in determining where the blockage was on Greene No. 1.

13

1248a

He acknowledged that Heath had difficulty finding a driller to schedule drilling the new well because the drilling industry was very busy at that time drilling Marcellus and other wells.

On cross-examination, Mr. Havranek acknowledged that the letter which he prepared for the Plaintiff that set forth his alternatives (Exhibit No. 16) would have taken about eight hours for him to prepare. He said that the time that he spent applying for the permits and getting permit approval from DEP would require about 20 hours of work.

Mr. Havranek said Greene No. 1 was the first case that he had worked on where there was a salt-collapsed well and that the producer did not use what was called a sidetrack drilling technique to fix the well. In this case, he concurred with the Plaintiff, Mr. Heath, that the better approach was to plug the existing well and drill a new well. This is because the Medina sand is much deeper than other gas wells in the area, and even deeper, at least in Barkeyville, then even a Marcellus well.

Mr. Willy from the DEP testified. He noted that 2008 and 2009 was a busy time for drilling. Oil at that time was selling for $80 to $100 a barrel and gas production and the Marcellus in this region was extremely active, especially in the Utica play in this immediate area.

14

1249a

He established, on Exhibit C, that on April 17, 2008, a chart, which is on the well, shows that date was the last date of production for Greene No. 1.

The defense called William Roach, who is a professional engineer, and qualified Mr. Roach as an expert in oil and gas production; especially in Pennsylvania. He has 36 years of experience. Mr. Roach was of the opinion that the Plaintiff, Mr. Heath, in responding to the plugged well, as of April 2008 did not exercise due diligence (objective prudent operator). He created a timeline with the best-case scenario and a worst-case scenario, and under both scenarios the well should have been repaired or the new well drilled within 18 to 28 months of when the blockage occurred. It was his opinion that the Plaintiff did not meet the standards -- the industry standards on reasonableness in terms of correcting the blockage or putting the well back into production.

He concluded that the recommendations of Mr. Havranek, as set forth on Exhibit 16, were consistent with what he would have recommended to the Plaintiff at the time. He notes that his completion, if done within a reasonable period of time, would have been done before the DEP came on the site and gave notice to the Plaintiff of a violation for nonproduction. In his opinion the well should have been completed, at the latest, in 2010.

15

1250a

He told us that in 2007 and 2008 and 2009, there were many DEP permits and applications were very busy, especially 2008 and 2009, for nonconventional wells, which is what is characterized as the Marcellus well.

He told us he would allow 28 months from April of 2008 to have the well either back in production or have a new well drilled. Mr. Roach produced and explained timelines which are Exhibits Y and Z.

He was of the opinion that Mr. Havranek's work was done in a timely fashion, once he began it, and that the permitting and drilling, once Havranek began his work, was not unduly slow. He acknowledged that the choice of drilling the new well versus the other several options proposed by Mr. Havranek is the option that he would have recommended.

He confirmed that the salt bed, which is like plastic, is the probable reason why the well casing collapsed.

And Mr. Roach opined that the technology in drilling is different and improved today from what it was in the early 1980s when the Greene No. 1 was drilled.

He opined that $400,000, the cost to drill Greene No. 2, was not unreasonable.

The values for gas were higher in 2008, 2009 and 2010. And the values of gas in 2012, 2013, 2014, are vastly below the values in 2008.

16

1251a

We are operating with the following timeline, which we find by preponderance of the evidence:

| | |
|---|---|
| People's Gas leased from Dellich | December 2, 1982 |
| Pool agreement of leases, 633 acres | July 24, 1983 |
| Cabot to Ironwood assignment recorded | December 31, 1962 |
| Heath assigned lease from Ironwood, Inc. to Heath | January 1, 2000 |
| DEP gives inactive status to well under Cabot for five years | August 30, 1998 |
| Heath extended the inactive status for one year | August 19, 1984 |
| Per Exhibit 24, there are issues with Greene No. 1 collapsing | 2003 |
| Pulling rig attempts to repair Ken Greene lease | March of 2008 |
| Greene No. 1 not producing, see Exhibit No. 4 | April 13 or 17, 2008 |
| Last letter with royalty check to Defendants, see Exhibit No. 22 | June of 2008 |
| Letter from Heath to Dellich with Shut-in fees | February 19, 2009 |
| Letter from Heath to Dellich with Shut-in fees | December 28, |

17

1252a

| | 2009 |
|---|---|
| Letter from Heath to Dellich with Shut-in fees | February 8, 2010 |
| Letter from Heath to Dellich with Shut-in fees | May 18, 2009 |
| Letter from Heath to Dellich with Shut-in fees | May 4, 2010 |
| Letter from Heath to Dellich with Shut-in fees | July 9, 2010 |
| Letter from Heath to Dellich with Shut-in fees | October 13, 2010 |
| Letter from Heath to Dellich with Shut-in fees | December 31, 2010 |
| Letter from Heath to Dellich with Shut-in fees | April 19, 2010 |
| Tom Havranek letter with five alternatives | February 16, 2011 |
| Application to DEP for inactive status | November 15, 2010 |
| Application denied, DEP, to put Greene No. 1 on inactive status | December 12, 2010 |
| DEP wrote letter to the Plaintiff giving him 90 days to remedy deficiencies noted in its letter | May 19, 2010 |
| Havranek and Heath meet with Speedy regarding sidetrack well | March of 2011 |
| Letter to DEP from Havranek, see Exhibit 26 | April 17, 2011 |
| Greene No. 1 plugged | May 25, 2011 |
| Notice of termination | June 9, 2011 |

18

| | |
|---|---|
| Letter from Heath to Dellich | July 1, 2011 |
| Complaint in declaratory judgment and quiet title filed | July 15, 2011 |
| Greene No. 2 drilled by Union Drilling Company | March 15, 2012 |
| Greene No. 2 fracked and Greene No. 2 in production | November 2012 |

## CONCLUSIONS OF LAW

The first issue the Court has to address as we resolve this matter is where lies the burden of proof. The Plaintiff would contend the burden of proof is by preponderance of the evidence on the Defendant. Both counsel have cited, and to some extent have followed, Phillips Gas v. Jedlicka, 615 Pa. 199, 42 A3d 261 (2012).

The Jedlicka case held that the party seeking to terminate the lease bears the burden of proof. At argument, counsel for the Defendant contended that that language would not apply because the Jedlicka case and the other cases similar to it are dealing with "production leases".
Cases which the defense counsel cited, and which Jedlicka addresses, involve situations where there is an oil and gas lease for a specific term. In some cases the term is five years, in some cases the term is two or ten years, and then the lease is extended beyond the initial term for a period in the

19

habendum clause, which most commonly, and in Jedlicka, is "for so long as oil and gas is produced in paying quantities."

Obviously, if there is no activity for the initial period of the lease, which in this case is five years, at the end of five years the lease terminates and the lessee is on the premises as a tenant at-will. On the other hand, if at the end of the term, as in this case five years, there is production, then so long as the production continues, the habendum clause has the lease continue.

The defense counsel would have this Court more closely rely upon Pemco Gas v. Bernardi, 5 D.&C.3d 85 (Armstrong Co. 1977), which is a decision out of Armstrong County, which was decided by the late Judge House.

The Pemco case, however, like the Jedlicka case, involves the issue of whether or not the lease in question continued beyond the initial term of the lease and is extended consistent with the habendum clause applicable. The Pemco case also involved a lease of five years, where the producer did not begin actively attempting to produce until right before the termination of the period of the lease, and then there were issues on whether or not the producer had demonstrated good faith effort to produce before the lease moved into the period beyond the initial term.

20

The Pemco lease does have habendum language very similar to the language in question.

In this case, nobody disputes that the well was drilled in 1987, and apparently was fracked in September of 1987, but then, in 1989, the producer applied for inactive well status. This tracks the testimony that there was some difficulty in finding a market for the gas.

The habendum clause, which is the operative language of the lease in this case has been recited as five years from April 2, 1983 and:

> "As long thereafter as the above described land or any portion thereof or any other land pooled or unitized therewith, as provided in Paragraph 3 hereof, is operated by the lessee in the search for or production of oil or gas or as long as gas is being stored, held in storage, or withdrawn from the premises by the lessee." Exhibit 2.

Apt in this case is the additional language that provides when a well has been drilled, but the well yields no royalty, the lessee may continue to hold the premises upon the continued payment of the delay rental or a further term of five years after the expiration of the term originally mentioned, which would be five years, and as long thereafter as the land, or any portion thereof or any other land pooled or unitized therewith is operated by the lessee in search for or production of oil or gas.

21

There is additional language relating to the storage of gas; however, the parties agree that this case does not involve a storage issue.

Therefore, the operative language of the lease is "whether the land is operated by the lessee in search for or production of oil or gas." This language appears, therefore, to be a fairly common clause for an oil and gas lease in Pennsylvania, and we construe the language as not being ambiguous.

We conclude, however, that the Defendants' contention on the burden of proof is in error. We conclude that once it is established that a well has been produced and that the lease has been in production, that the burden then is on the landowner, and not the producer, to demonstrate that the lease is no longer in production.

Pennsylvania cases have characterized this as a fee simple interest that is determinable or subject to reversion. We construe that to mean that once the producer (lessee) has expended the resources to produce a well and produce on the premises, that the lessor then has the burden to show that there is no longer "search for or production of oil or gas."

Jedlicka, pp 208-209, Jedlicka relies on Young V. Forest Oil Co., 194 Pa. 243, 45 A. 2nd 121(Pa. 1899). The Young case, although quite ancient, states the law of Pennsylvania for construing the lease in question. Pennsylvania applies a purely

22

subjective test to determine an oil or gas lease "has produced in paying quantities" or, as here, "in search for or production of oil or gas." Our inquiry then, is whether Heath, during the relevant period, acted in good faith in operating the well or wells on the lease in search for or production of gas. As Defendant's expert opines, Heath's getting Greene No. 2 into production was not timely, but Heath credibly testified to the vast uncertainties, obstacles, and substantial costs he incurred to determine the best way to restore or replace the production of the well.

Taking the language of the habendum clause in this lease to its logical conclusion, we conclude that the Defendant must show that the lessee in this case up to the time of notice of termination, was not searching for or producing oil or gas on the premises. Evidence of Plaintiff's conduct after the notice to quit was relative to Plaintiff's state of mind, and in this case, also shows a course of conduct. We apply the subjective standard.

Two quotes from the Jedlicka case which we consider especially apt:

> "So long as the lessee is acting in good faith on business judgment, he is not bound to take any other party's, but may stand on his own. Every man who invests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No Court has any power to impose a different judgment on him, however erroneous it may

23

deem his to be. Its right to interfere does not arise until it has been shown clearly that he is not acting in good faith on his business judgment, but fraudulently, with intent to obtain a dishonest advantage over the party to the contract. Nor is the lessee bound, in case of difference of judgment, to surrender his lease, even *pro tanto,* and allow the lessor to experiment. Lessees who have bound themselves by covenant to develop a tract, and have entered and produced oil, have a vested estate in the land, which cannot be taken away on any mere difference of judgment. " Colgan v. Forest Oil Co., 194 Pa. 234, 45 A. 119 (PA. 1899).

Quoted in Jedlicka at 213-214.

"In determining paying quantities, in accordance with the above standard, the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator. Some of the factors are: The depletion of the reservoir and the price for which the lessee is able to sell his produce, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances, and whether or not the lessee is holding the lease merely for speculative purposes." Jedlicka quoting Clifton v. Koontz, 325 S.W.2d 684, 691, (1959). Jedlicka, at 273.

Pennsylvania cases have characterized the foregoing analysis as a fee simple interest that is determinable or subject to reversion. We construe that to mean that once the producer has expended the resource to produce a well and produce on the premises, the lessor then has the burden to show there is no longer search for or production of oil and gas by the lessee.

24

Taking that language along to its logical conclusion, we conclude the Defendant must show that the lessee in this case, up till the time of notice of termination, was not searching for or producing oil or gas.

## Discussion

In balancing Heath's contended good faith operation against the unrefuted testimony of Mr. Roach that Heath was extremely slow in getting the well back to production, we conclude it is not a question of industry standard or even reasonableness as to the time Heath took. What is controlling is that a review of the time line and all the evidence presented to the Court, especially, taking into account the huge amount of expenditures: $400,000 for the new well, $300,000 for the compression station, $75,000 for the original cost of the well, plus the cost of laying a pipeline to the Atlas line and the vast uncertainties relative to gas prices over the period; the uncertainty whether the new well would produce at all, demonstrates that, notwithstanding the delay, Mr. Heath steadfastly and inexorably worked, expended money and took action to get the well back into production.

Our conclusion is buttressed by the consistent payment of the shut-in fees, Plaintiff's conferring with consultants, his explanations to lessors as he sent shut-in fees, and his

25

statement and explanation in his letter of his problems with the well.

For example, Exhibit 4, a letter from Heath to Defendants, dated February 19, 2009, expressly states, "Attempts have been made, but have not been successful to this point." This statement clearly establishes that Heath had been attempting to repair the well. The standard is not the timeliness of the effort, rather whether the producer, in good faith, is attempting to produce gas.

Taking into consideration the uncertainties in gas prices, the costs expended for the compression station, the difficulties in finding drillers at the time of drilling, we conclude that Heath exercised good faith and there is no evidence that he wavered on whether he would try to get the production restored for the lease. We are especially persuaded by his constant attempt to assuage the lessors with shut-in payments and letters indicating his intent to put the well back on production. (Exhibit 4).

Other than the delay, there is no evidence that supports a contention that Heath had abandoned the well or was stalling, manipulating the lease, or acting fraudulently toward Defendants or the other lessors. DEP at one point, in compliance with its regulations, characterized the well as "abandoned," but at that point, and even well before, the

26

1261a

record is replete with efforts indicating that Heath was trying to get the well back into production.

We accept, as credible, the testimony of Heath that he was throughout solving the difficult issues of the best way to get the well into production. As you listened to the testimony, it was clear that his preference was to try to repair Greene No. 1, but at the point when Mr. Havranek gave him the opinion that drilling another well would be more efficient, less costly, and probably more productive, he accepted Mr. Havranek's opinion.

We therefore conclude that the verdict in this case should be in favor of the Plaintiff, which is to grant the declaratory judgment and confirm the title, at least as to the lease, in the Plaintiff. We will enter an appropriate order.

For purposes of Pa. R.C.P. 1038(c), we acknowledge that the opinion was supposed to be filed within seven days of the trial; however, our finding is that this case presented extraordinary complexity and required more than seven days to write and print.

BY THE COURT:

H. WILLIAM WHITE, Senior Judge

sab
Cc:   William J. Cisek, Esquire (814-437-1410)
      Robert Coyer, Esquire (814-704-2449)

1262a

DANIEL L. HEATH,        : IN THE COURT OF COMMON PLEAS OF
         Plaintiff        : VENANGO COUNTY, PENNSYLVANIA
                       :
vs.                        :
                       :
GEORGE D. DELLICH and      : CIV. No. 848 - 2011
MARY ANN DELLICH,         :
         Defendants       :

**FILED**

JAN 28 2016

COMMON PLEAS COURT
VENANGO CO. PA

## OPINION

AND NOW, this 28th day of January, 2016, the Court has for consideration Defendant's Motion for Post-Trial Relief pursuant to Pa. R.C.P. 227.1 docketed October 13, 2015.

The Court heard argument in this matter. Both counsel submitted memorandum and the Court has considered the briefs. The Court will deny the motion for Post-Trial Relief. Some of the issues raised on the Motion for Post-Trial Relief we conclude, however, deserve explanation by the Court.

We are satisfied that the findings which we docketed on October 7, 2015, are consistent with the facts of the case generally and our conclusions of law, we conclude, are sound and the disposition docketed on October 7, 2015, shall remain the primary explanation for and the order of this Court.

Counsel in the Post-Trial motions in Paragraph 10 recites that some of the findings of fact and conclusions of law are not supported by any evidence. Counsel references Page 17 and 18 of the brief, which is incorporated in the motion. On Page 18 of

1

1289a

the brief there are numerous specific allegations of findings that are not supported by the evidence. We will deal with those issues seriatim:

a. The number of leases in the pulling agreement is not really material. We do not intend to spend any time on this issue.

b. Page 2 of the opinion does recite the well was drilled within two years, that is either error or a typo. We recite at least one other time in the opinion that the well was drilled in 1987 (See for example Page 4 of the findings).

c. The last letter with a royalty check from the plaintiff, Exhibit 72, was sent in June 2008. We reference our "time line" Page 18.

d. The allegation is that the Court mischaracterized the time frame of Shawn Speedy's involvement. The notes of testimony establish that there was credible testimony that Shawn Speedy met with Mr. Havranek and the plaintiff in March of 2011 to discuss the concept of remediating the well with a "sidetrack" method (Notes of testimony Volume II, Page 271).

e. That there were five different properties pooled and the plaintiff's property is about 80 acres, we do not consider this point as material.

1290a

f. Mr. Heath testified in two different places that he was advised by DEP to apply for inactive status. We found that testimony credible. (See Volume I of transcript Page 114 and Page 113, Line 6.)

g. Page 115 Mr. Heath testified about gas going to a station which he has established and the gas is made ready to put into truck tractors. That testimony supports the Court's finding on the gas operations and the market which Mr. Heath created for the gas from the relevant well.

h. The evidence supports that checks were received by the Defendants as late as July of 2011. Mr. Dellich (Page 78 of Volume I of the transcript) admits receiving a check July of 2011 and Exhibit 4 also supports that inference.

i. Evidence as to the fact that gas prices have been volatile is established through the testimony of Mr. Roach, Volume II, Page 366.

j. Testimony of one witness did refer to the defect that was causing the collapse as a salt column and in another place referred to it as a sand sore or column.

k. It was a bone of contention whether the payments were for "shut—in" royalty or for some other intention. Heath's contention it was for shut—in royalty and he so

testified repeatedly. Defense counsel's position is that such language flaunts the language of the lease. We conclude that Heath made the payments in good faith in an effort to demonstrate to the lessees that he was fully intending to maintain the well in operation, which was the subject of the lease.

l. Mr. Havranek testified that they actively considered a "sidetrack" plan and that was the reason that Mr. Speedy was consulted. The testimony does not support that Mr. Havranek had worked a sidetrack method with other wells. To the extent that that is the finding, that is incorrect. Havranek consulted a driller who referred him to Speedy and Speedy was engaged because he apparently had some expertise with the "sidetrack" technique.

m. The Capital Iron assignment occurred on December 31, 1962 is clearly a typographical error. That error is on Page 17, which is our time line. The Capital Iron assignment was recorded 1992.

n. The letters to the Defendants from the Plaintiff are set forth in Exhibit 4.

The rest of the issues raised as to errors in findings of fact are not material.

The other issue which the Court needs to address is

4

the issue as to Exhibit 26.

Defendant notes that Exhibit 26 was never admitted into evidence; therefore, it was error for the trial court to rely upon the same. The discussion on the record as to Exhibit 26 is in the transcript Pages 281 to 291 and occurs during the testimony of Mr. Havranek. Defense counsel initially, as we discussed the admissibility of Exhibit 26, agreed it was admissible and did not object; however, once it was established that Exhibit 26, which was a transmittal letter to DEP, also contained enclosures and there was some dispute as to what the enclosures contained and also as to whether or not DEP even received the letter, counsel for the Plaintiff withdrew Exhibit 26 and Exhibit 26 was not received into evidence. When counsel for the Plaintiff withdrew Exhibit 26 he said that he was satisfied that the record showed that the letter, which was dated April 17, 2011, was, in fact, sent and was mentioned to show activity and that he did not need to have in evidence the substance of the letter. We are treating the record as establishing that on April 17, 2011, a letter was sent from Havranek to DEP but the contents of the letter were not received into evidence. Whether this letter was sent or not is not very material to the overall disposition of the case.

We confirm, therefore, that other than as noted above we are satisfied with the findings and the conclusions of law

5

docketed October 7, 2015.

The Court will dismiss the Defendant's Motion for Post-Trial Relief.

BY THE COURT,

H. WILLIAM WHITE, Senior Judge
**Specially Presiding**

Court Reporter/gjc
cc: William J. Cisek, Esquire
Ronald Coyer, Esquire

6

1294a

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY, PENNSYLVANIA

DANIEL HEATH,
    Plaintiff,

    v.

GEORGE DELLICH and
MARY DELLICH,
    Defendant.

:
:
:
:
:
:
:
:
:

CIV. No. 848-2011



## OPINION OF COURT

AND NOW, this 24 day of March, 2016, the Court has before it Defendants' Concise Statement of Matters Complained of on Appeal. This Court is of the opinion that these issues raised in the Concise Statement have been adequately addressed between the Findings of Fact and Conclusions of Law, filed on October 7, 2015, and the Opinion of Court, dated January 28, 2016, issued in response to Defendants' Motion for Post-Trial Relief. For this reason, the Court will stand by its reasoning as supplied in these documents, and no further opinion is necessary.

BY THE COURT,

_____
H. WILLIAM WHITE, President J.
*Specially Presiding*

cc:    William J. Cisek, Esq.
       Robert Coyer, Esq.

1299a